# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
July 24, 2019 Session

### STATE OF TENNESSEE v. TYSHON BOOKER

**Appeal from the Criminal Court for Knox County**
**No. 108568   G. Scott Green, Judge**

_____

### No. E2018-01439-CCA-R3-CD

_____

During a botched robbery, sixteen-year-old Tyshon Booker, the Defendant-Appellant, shot and killed the victim, G'Metrick Caldwell.  Following extensive hearings in juvenile court, the Defendant was transferred to criminal court to be tried as an adult. [1]  At trial, the Defendant admitted that he shot the victim several times in the back while seated in the backseat of the victim's car; however, he claimed self-defense.  A Knox County jury convicted the Defendant of two counts of first-degree felony murder and two counts of especially aggravated robbery, for which he received an effective sentence of life imprisonment.  In this appeal as of right, the Defendant raises the following issues for our review: (1) whether the process of transferring a juvenile to criminal court after a finding of three statutory factors by the juvenile court judge violates the Defendant's rights under Apprendi v. New Jersey, 530 U.S. 466 (2000); (2) whether the State's suppression of alleged eyewitness identifications prior to the juvenile transfer hearing constitutes a Brady violation, requiring remand for a new juvenile transfer hearing; (3) whether the juvenile court erred in transferring the Defendant to criminal court given defense expert testimony that the Defendant suffered from post-traumatic stress disorder (PTSD) and was amenable to treatment; (4) whether the trial court erred in finding that the Defendant was engaged in unlawful activity at the time of the offense and in instructing the jury that the Defendant had a duty to retreat before engaging in self-defense; (5) whether an improper argument by the State in closing arguments constitutes prosecutorial misconduct requiring a new trial; (6) whether evidence of juror misconduct warrants a new trial and whether the trial court erred in refusing to subpoena an additional juror; and

---

[1] On February 19, 2016, the juvenile court severed the Defendant's case from co defendant Bradley Robinson for purposes of the transfer hearing.  While the record contains lengthy discussions regarding the codefendant, including his statement implicating the Defendant in this crime, the codefendant did not testify at the Defendant's trial.  The disposition of the codefendant's case is not reflected in the record.

(7) whether a sentence of life imprisonment for a Tennessee juvenile violates the United States and Tennessee Constitutions.[2] Discerning no reversible error, we affirm.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Mark E. Stevens, District Public Defender, and Jonathan Harwell (at trial and on appeal) and Chloe Akers (at trial), Assistant Public Defenders, for the Defendant-Appellant, Tyshon Booker.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Charme Allen, District Attorney General; and Takisha M. Fitzgerald and Phillip Morton, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

### Juvenile Court Proceedings

Two days after the offense, November 17, 2015, the Knox County Juvenile Court ordered the Defendant's "fingerprint card" to be released to the Knoxville Police Department (KPD) for use in the investigation of the victim's death. On the same day, the juvenile court signed an order for attachment after finding probable cause that the Defendant committed the delinquent and unruly offense of first-degree murder. On November 18, 2015, a juvenile court magistrate signed an attachment for the Defendant. On November 23, 2015, a probable cause hearing was conducted in Knox County Juvenile Court. Based on the testimony of Detective Clayton Madison of the KPD Violent Crimes Unit, the juvenile court determined there was probable cause as to the Defendant and the co defendant. On November 19, 2015, the State filed a motion to transfer the Defendant to Knox County Criminal Court to be tried as an adult. The Defendant filed a motion in opposition to this motion on January 4, 2016, arguing that "[t]ransfer would expose him, upon conviction, to an automatic life sentence of at least fifty-one years[,]" which he asserted was unconstitutional.

The Defendant's transfer hearing occurred on February 26, 2016, and June 9-10, 2016. Linda M. Hatch testified that she lived next door to the Defendant and that he went to school with her daughters. Sometime prior to the offense, Hatch picked up the

---

[2] We have reordered the Defendant's issues for clarity.

Defendant as he was "walking up the road and needed a ride." From that point on, the Defendant came over to her house "almost daily." She called the Defendant "son" and treated him like "one of [her] kids." She was aware that the Defendant had a Facebook account. At some point during "the week of November the 6th," Hatch observed the Defendant in possession of his brother's pistol, and she admonished him. Although the Defendant returned his brother's gun, the Defendant had another gun, a nine millimeter, "[w]ithin days." Hatch observed the Defendant shooting the gun on her back porch "several times," and she believed the Defendant had only a few bullets left. Prior to the offense, Hatch had set up a camera on her kitchen table to record the Defendant and his friends because she had become suspicious that they were stealing money from her daughter. The camera captured the Defendant with a nine millimeter gun as well as codefendant Robinson, whom Hatch knew as "Savvy," with a .32 caliber gun. The State played the video recording for the juvenile court, which was admitted as an exhibit to the hearing.

On the day of the offense, the Defendant texted Hatch at 3 p.m., and again at 6:11 p.m., stating, "Hey, please come get me right now from where you dropped us off." She understood this to be the place where she dropped off the Defendant and the codefendant the previous Friday. By the time Hatch responded to the Defendant, he was no longer at the location. The next morning, the Defendant came to her house "very upset, very nervous." Hatch said the Defendant wanted to talk to her, and she asked, "Ty, what's wrong?" The Defendant replied, "Mom, I f----- up[,]" and "Mom, I killed a man." The Defendant told Hatch he "shot him with that gun." "[The Defendant] said that [the codefendant] had it planned to rob this guy, and he didn't even know him. And he said that it just went wrong." The Defendant also told her that they were going to get him for "overkill," and he "shot him a lot." The Defendant said, "when the [victim] was fighting to try to get away from [the codefendant]," [the codefendant] told him to shoot, and he "just kept shooting." The Defendant told Hatch that he shot the victim four or five times, and he saw the victim "laying there dead." The Defendant also told her that he threw the gun away.

Hatch testified that the Defendant came back to her house the following morning, and he "wasn't so upset." She said the Defendant told her, "They don't even have the right descriptions. They have no clue it was us." She said the Defendant was "back to kind of being his cool, sweet, charming self."

On cross-examination, Hatch testified that the first time she met the Defendant, he was walking down the street with a ripped trash bag, and she stopped and asked him if he needed a ride. She said the Defendant was upset because he had just gotten in a fight with his mother, and she had told him to get out of the car. Hatch told the Defendant that he could text her anytime, and she would give him a ride or bring him food. She primarily

communicated with the Defendant through Facebook Messenger because he could use it through Wi-Fi. She described the Defendant as "very intelligent and so, so sweet," and she said that the Defendant wanted to be a rapper. She described her love for the Defendant as that of a mother to a child. She lectured the Defendant "many a times" on staying away from "doing drugs or robbing people or being involved in any of that behavior[.]" Hatch testified that "it all went downhill" when the Defendant started hanging out with the codefendant, who was on the run for a violation of probation. Hatch also described the day that the Defendant was arrested in her home. After the police arrested the Defendant and left Hatch's house, she left to pick up the codefendant and informed the police, who showed up to arrest him. A few days later, Hatch went to the police station to give her statement.

A series of Facebook messages between the Defendant and Hatch were also admitted into evidence. Several of these messages included references to the Defendant selling drugs, but Hatch testified that she was trying to figure out what the Defendant had so she could tell her husband. She said that she did not report this to the police. Hatch also sent the Defendant pictures of marijuana and wrote "Yummy" under one of the pictures. In another set of messages, the Defendant wrote, "I need some weed[,]" to which Hatch responded, "You want to go in half?" She explained that she was asking this on behalf of the codefendant. She also messaged the Defendant, "Flower man just called taking orders[,]" which she explained was the man down the street asking if anyone wanted to buy marijuana. In another message, Hatch sent the Defendant a link to a picture of breasts, which she said was in reference to an exotic cake that she made. She denied a sexual relationship with the Defendant. Hatch admitted taking several "sexy pictures" of the Defendant but explained that the Defendant asked her to take those pictures. Hatch testified that she did not get paid for her testimony.

KPD Officer James Wilson testified that he was working patrol on the day of the offense when he received a call of a shooting on Linden Avenue. Upon arrival, he observed the victim, "laying partially in the car and partially out of the car." Officer Wilson noticed that the victim had been shot and called for medical attention. Officer Wilson then secured the area where he observed shell casings and canvassed the neighborhood. The State introduced several photographs of the victim's car, one of which depicted a handgun in the driver's side floorboard.

Timothy Schade, a KPD crime scene technician and certified latent print examiner, testified that he also responded to the shooting call and took several photographs of the crime scene, most of which showed cartridge casings. Schade also recovered four casings from inside the car and one from outside, and he processed several items from inside the car for fingerprints. The victim's car was towed to the KPD's Forensic Unit garage, and Schade processed the car for fingerprints with magnetic

- 4 -

powder. One set of prints matched Kevaugh "Lil Kill" Henry, but the other seven sets did not appear in the Automated Fingerprint Identification System (AFIS). Schade eventually fingerprinted the Defendant, and he was able to match the Defendant's prints to six identifications "on or around the passenger side door" of the victim's car. He found "three finger or palm prints on the exterior of the car that matched [the Defendant]" and one from the interior of the car near the armrest matching the Defendant. He also found five sets of prints matching the codefendant that were located on or around the exterior door on the front passenger side of the victim's car.

On cross-examination, Schade explained that the first casing was recovered on the street outside the rear passenger side of the car. The second casing was recovered from "the little section on the passenger side rear door that you would use to grab the door to shut it." The third casing was found in the floorboard of the front passenger seat. The fourth casing was recovered from the floorboard of the front driver's seat, and the fifth was recovered from the floor of the rear driver's side. A sixth shell casing was never recovered.

Schade further explained that people do not always leave fingerprints behind when they touch a surface. He matched prints taken from a Powerade bottle recovered from the victim's car to the victim, but he was unable to match the prints recovered from a Coke bottle or the gun to anyone. Schade testified that there are variables that determine why one fingerprint might be lighter and another might be darker. He said that he "couldn't scientifically say whether a print was left today or yesterday or last week." On redirect examination, Schade testified that Kevaughn "Lil Kill" Henry's prints were lighter than the other prints on the car.

Dr. Phillip Axtell, a licensed psychologist, testified that he received a court order to evaluate the Defendant. He was told not to ask the Defendant about his arrest or the events on the day of the crime, which limited his evaluation to treatment recommendations. He conducted a psychosocial evaluation of the Defendant based on a sixty to ninety-minute clinical interview. He recommended "[t]reatment and counseling, primarily to deal with stress, benefit from counseling or therapy to help [the Defendant] cope with memories from previous traumatic events, individual and/or group therapy, therapy to give him extra coping skills." He said these services could be provided "in a detention facility, in-patient, or as an outpatient basis." He said that PTSD was a possible diagnosis, and his report was admitted as an exhibit to the hearing.

Justin Campbell, the Court Division Coordinator for first-time offenders in juvenile court, supervised the Defendant for offenses including disorderly conduct, false report, curfew violation, and an active runaway petition. Although the Defendant was

"very well[-]mannered and respectful," he did not follow through on his probation requirements.

Dr. Keith Cruise, an Associate Professor of Psychology at Fordham University, evaluated the Defendant regarding his "current mental health functioning," "exposure to traumatic events and possible current traumatic stress reactions," and "possible rehabilitation." Dr. Cruise conducted evaluations of the Defendant in January and May 2016. As part of his first evaluation, Dr. Cruise met with the Defendant at the detention center for six hours. He described this as a "structured interview" in which he reviewed mental health symptoms. He also interviewed members of the Defendant's family. He conducted the second evaluation to "provide additional information about possible rehabilitation services and an update to any opinions from [his] initial report." Dr. Cruise also reviewed the Defendant's Department of Children's Services (DCS) school records, his arrest report, his juvenile social file, the petition from this case, Dr. Axtell's report, and a letter from Natchez Trace. Dr. Cruise described significant events from the Defendant's life, including the loss of his father before he was born, growing up in what he called a "war zone," witnessing family violence, being shot at, and experiencing the deaths of his aunt and his grandfather.

Dr. Cruise diagnosed the Defendant with three disorders: PTSD, Moderate Cannabis Use Disorder, and Conduct Disorder. He described the death of the Defendant's grandfather as the "turning point" for his PTSD. Dr. Cruise opined that an adult correctional facility would be "ill-equipped" to respond to the Defendant's mental health needs. The Defendant was accepted into Natchez Trace youth facility, which Dr. Cruise stated would have appropriate treatment options for the Defendant. Dr. Cruise believed that the Defendant was amenable to treatment, and he noted that the Defendant was willing to participate in trauma-based treatment.

On cross-examination, Dr. Cruise acknowledged the Defendant's school suspensions beginning in 2011 through 2015, noting that the Defendant's school suspensions decreased after his grandfather's death. Dr. Cruise also noted that the Defendant was a member of "The Chain Gang," which he concluded was not a real gang. Dr. Cruise stated that he did not look at the Defendant's Facebook page as part of his evaluation, and he opined that the Defendant was truthful throughout his interviews.

In determining whether to transfer the Defendant to criminal court, the juvenile court considered the factors as outlined in Tennessee Code Annotated section 37-1-134(a)(4). In regard to part (A), whether there was probable cause to believe that the child committed the delinquent act as alleged, the juvenile court reasoned, in pertinent part, as follows:

- 6 -

I've heard a lot of people in my lifetime try to define what reasonable grounds means. I've heard it called probable cause. I've heard it called a balancing test. I heard [defense counsel]--I listened very carefully to her--refer to it as a preponderance of the evidence. We know that it does not approach the level of moral certainty. It doesn't get there.

I tend to try to break things down simply. What it means to me is [] it reasonable for me to believe based on the evidence that I heard that [the Defendant] was there and took the victim's life. Is it reasonable for me to believe that.

I don't have to be certain. I don't have to be sure. I don't have to ultimately know the answer, but is it reasonable to believe. And in examining whether it's reasonable for me to believe I must look at possibilities.

I think the fingerprints through all that confusion and all of the testimony and all of the slides and the breakdown--all the fingerprints really tell us is that at some point at sometime he was at or in that car. We know that. No doubt.

Then we look at the testimony of Ms. Hatch. And for the record, I find parts of her testimony despicable. That's the nicest thing I can say about my feelings about her relationship with this young man. Despicable.

I believe in my heart Ms. Hatch is one of the reasons that we're sitting here today. I believe he was allowed to be at Ms. Hatch's when he didn't need to be there. I believe he was into bad things with Ms. Hatch. I believe he and the other young men were in an enterprise with Ms. Hatch and were running wild.

I was offended, disturbed, creeped out by Ms. Hatch. But I also believe he told her, "Mama, I 'effed' up. I killed a man." I believe he said that. I believe she heard that. Despite the improper nature of their relationship, despite the obvious enterprise that they were in, despite the fact she creeps me out, I believe that this young man told her that. I believe those were his fingerprints on the car that day. From those two things I find reasonable grounds to believe that he committed the delinquent act.

The juvenile court observed that part (B) of the statute was not in dispute in the Defendant's case and stated that there was "reasonable grounds to believe that [the Defendant] is not committable to an institution for the developmentally disable or mentally ill." Regarding part (C), whether there was probable cause to believe that the interests of the community required that the child be put under legal restraint or discipline, the juvenile court stated that it agreed with both mental health experts "completely" and that it "[did not] doubt for a minute that the adverse childhood experiences [the Defendant] suffered could have led to [PTSD]." The juvenile court also agreed that the Defendant suffered from Cannabis Use Disorder and Conduct Disorder.

The juvenile court then engaged in an extensive analysis of each of the six factors under section 37-1-134(b), and concluded, in pertinent part, as follows:

> The extent and nature of the child's prior delinquency records. They don't tell us a whole lot here. There's not a whole lot of history here from delinquency.
>
> If I looked at the ACS records, if I listened to the reports and the information that the psychologists had been given -- although I have to weigh their opinion by what they've not been told -- I think they were both at a very unfair disadvantage. They were not allowed to question the child about the acts or the things that lead up to the acts, because the defense was attempting to put on a defense to the reasonable grounds to believe that it happened. So they're not going to let their experts ask questions about the facts leading up to that day. And I think that made it tougher for them to do their job.
>
> But I think the extent and nature of the child's prior delinquency records is not of great importance here, because he just had his first brush with the court system and wasn't – I don't think there's a lot there that's going to change and help me make my decision one way or the other as to whether the interests of the community require that the child be put under legal restraint and discipline.
>
> "The nature of past treatment efforts and the nature of the child's response thereto." Well, there hasn't been much – hasn't been any, and what little he was tried to be given here he didn't play. He was off running wild at Ms. Hatch's and smoking dope and selling dope and playing on the

Internet and shooting guns off the back porch of the house with her watching.

. . . .

"Whether the offense was against a person or property with greater weight in favor of the transfer given to an offense against a person." This was murder. A person died, and his life meant something. And what the statute is talking about here is when you hurt someone or you take someone's life, there's a greater weight in favor of transfer. Not much any defense team can do with that except point out that's pretty much the case in all murders.

I think the important question here --now, let me talk about (6) first before I get to (5), which I think may be the more important factor in this case. "Would the child's conduct be a criminal gang offense."

. . . .

I don't know if five people in a "Chain Gang" makes it a gang or not, but I'm not too worried about it one way or the other in this case. It's a factor, and it's an important factor in Knoxville, particularly with the level of organization we seem to have out there. I can't tell in this particular case whether it makes a whole lot of difference or not.

I think what's more important is the people that were there that day acted in concert. I don't have any idea if they're officially in a gang. I don't have any idea where to draw that line; if five people make a gang, if it takes 20. No one has ever told me. But there's certainly some argument each way on factor number (6) whether this was a gang offense. And I can understand the defense's position that it was just a group of kids hanging out together. I don't know where you draw that line.

But again, I think the possible rehabilitation of the child is what this case comes down to in my mind. And the General hinted at it in her argument twice, that he's 17 years and three months old. He has 21 months left. What's available out there to rehabilitate someone to make them a productive citizen that I would feel safe about putting out in the community? What's available out there to do that in 21 months? Because if I keep him here when he's 19, he walks. He does whatever he wants to. So 21 months? How can I take a person whose conscience has been so

killed that the taking of a human life has so little value, how can he be rehabilitated in 21 months with the time I got left?

Based on the testimony I've heard, I must conclude that he can't. The decision will be to transfer him and try him as an adult.

Accordingly, on June 10, 2016, the juvenile court entered an order for the Defendant to be transferred to criminal court to be tried as an adult.

## Criminal Court Proceedings

On July 27, 2016, a Knox County grand jury indicted the Defendant for two counts of first-degree felony murder (counts 1 and 2) and two counts of especially aggravated robbery (counts 3 and 4). On September 23, 2016, the Defendant filed a motion to dismiss counts 1 and 2 of the indictment, arguing that, if the Defendant was convicted on these counts, he would face an automatic life sentence of at least fifty-one years. The Defendant argued, "Such an automatic sentence, imposed without consideration of [the Defendant's] unique characteristics or the general nature of juvenile development, and without regard to whether he himself intended to kill, would be unconstitutional."

**Trial.** On January 22, 2018, the Defendant's eight-day jury trial began. Phyllis Caldwell, the victim's mother, testified that she last saw her son alive on Sunday, November 15, 2015, when he left for work. She communicated regularly with her son by his cell phone, which was 865-216-[xxxx]. She continued to text the victim, but he stopped responding. She informed the police that the victim had an Apple cell phone, but she never saw that phone again. She continued to pay the victim's phone bill for several months after his death to assist the police investigation. Michael Mays, an employee of Knox County Emergency Communications District, explained that two 911 calls were made on the day of the offense, a recording of which was admitted into evidence and played for the jury. A computer aided dispatch (CAD) report, which generates all activity pertaining to 911 calls, was also admitted into evidence. The first call from Alneshia Allison was received at 5:23 p.m. She reported that someone had been shot and was hanging out of his car. Allison testified at trial and confirmed the substance of the 911 call. The second call was received from Ralph Hunter, who also testified at trial. On the day of the offense, Hunter was sitting on his front porch on Linden Avenue and heard gunshots. When he looked up the street, he saw "two young men running from a maroon car that was parked on the opposite side of the street." Hunter initially heard two gunshots and then "a few more" soon thereafter. On cross-examination, Hunter

explained that he heard a total of six or seven gunshots with only "a matter of seconds" between the first two shots and the second four shots.

Sergio Rosles lived on Linden Avenue and had two dogs. He also had several video cameras set up around the outside of his house. Rosles testified that on the day of the offense he "suddenly heard about three gunshots." He looked outside his front window and saw "two or three" people running on the right side of a car. Rosles later reviewed the video surveillance from his home camera system and provided it to the police. The State introduced this video into evidence and played it for the jury. The parties agreed that, although the time stamps on Rosles's videos were not accurate, they were useful for computing the correct times for when events occurred. Rosles explained that, at an hour, seven minutes, and seventeen seconds into the video, the video shows a red car and "two people running to the yellow house." He stated that the police arrived five to ten minutes later.

The video also shows four camera angles around Rosles's house. One of the camera angles shows Rosles's front porch, and his dog can be seen sitting on the porch. Three of the cameras show the streets around Rosles's house. At 6:52:26, a car can be seen pulling over and stopping on Linden Avenue near Rosles's house. At 6:54:00, Rosles's dog jumps. The parties agreed that this was the moment that the first shots were fired. People can be seen running from the car, but they are unidentifiable. A police cruiser, which was later determined to be KPD Officer Jimmy Wilson's vehicle, arrives on the scene at 7:00:06.

KPD Officer Jimmy Wilson, the first officer to arrive at the scene on Linden Avenue, testified that he was less than half a mile from the crime scene when he received the shots fired call. He then activated his emergency recording equipment and responded to the scene. Officer Wilson explained that his police cruiser was in "full record mode" with both audio and video at that time. The video reflects that he received the call at 5:24 p.m. Upon arrival, Officer Wilson secured the scene and determined that the victim did not have a pulse. He observed shell casings inside the victim's car as well as a firearm laying inside the car. He never saw or heard a cell phone from inside the car while he was at the crime scene. He explained that the victim "had his feet and from about his hips down to his feet inside the car," and "his shoulders and his head [were] resting on the ground outside the car as if he was in the driver's seat and had just simply fallen out on his body facing westbound." Officer Wilson also assisted in canvassing the neighborhood for information and searching for the suspects with his K-9 partner. The State introduced the full cruiser recording, which shows Officer Wilson arriving at the victim's car at 17:25:30 or 5:25:30 p.m. The parties agreed that Officer Wilson's cruiser video had an accurate time stamp. The State also introduced screen shots showing when Officer Wilson activated his camera into full record mode and when he left the crime scene.

- 11 -

KPD Sergeant Jeremy Maupin assisted at the crime scene and spoke to witnesses in the area, one of whom heard gunshots and the other who saw the suspects fleeing from the victim's car. He also observed a surveillance video from the Thumbs Up Market, which showed two individuals in dark clothing running westbound through the alley, but he was not able to recover this footage.

Timothy Schade, an expert in the field of a latent fingerprint examination, described the different processes for obtaining latent prints and the variables involved with leaving a fingerprint behind. Schade also responded to the scene on Linden Avenue and took hundreds of photographs of the crime scene and the evidence collected. The first set of photographs depicted the victim's car at the crime scene. Several of the exhibits showed cartridge casings, a gun on the front driver's side floorboard, a t-shirt and a glove on the front passenger's side floorboard, a Coca-Cola bottle, a Powerade bottle, and a phone charger. Schade did not recover a cell phone from the car. A set of photographs showing the evidence after Schade collected the items from the victim's car, a set of photographs showing the victim's car after it was taken to KPD's garage, and a set of photographs showing the fingerprints left on the victim's car were also admitted into evidence. Schade recovered five spent shell casings from the crime scene. He also recovered a plastic container holding several pills. Schade explained that he used magnetic powder to recover fingerprints from the victim's car.

Schade went to the Defendant's house and took pictures which showed rounds of ammunition recovered from a headboard in the front bedroom of the Defendant's house and two cell phone covers. Schade also took pictures of the items taken from the codefendant after he was arrested, which included a backpack, a gun, cartridges, and a cell phone. Schade also went to the Medical Examiner's office, fingerprinted the victim, performed a gunshot residue kit on the victim, and collected all the evidence from the victim, which included the following: clothing, six spent rounds collected from his body, a package of Swisher Sweet Cigarillos, a baggie of marijuana, and $835 in cash. Four spent cartridge casings, a nine millimeter, two Lugers, and an FC nine millimeter, were also admitted into evidence. The gun that was recovered from the victim's car, a SCCY nine millimeter was also admitted into evidence, and Schade noted that he took buccal swabs from the Defendant and the codefendant.

Schade recovered three sets of prints from the outside of the victim's car which belonged to Kevaughn "Lil Kill" Henry, the codefendant, and the Defendant. He specifically compared the fingerprints of J'Andre Hunt to the latent prints from the items recovered from the scene, which were not a match. Schade fingerprinted the Defendant following his arrest, and these print cards were entered into evidence. Schade matched the Defendant's fingerprints to the following areas of the victim's car: "above the wheel

well on the passenger side and behind the rear door going towards the back of the car[,]" the passenger side armrest on the interior side of the door, and the exterior side of the rear passenger door. Schade confirmed that these prints belonged to the Defendant.

On cross-examination, Schade testified that, when he arrived on the scene, the front doors of the victim's car were open, and the rear doors were closed. Schade did not move the gun found in the front driver's side floorboard before photographing it, but he could not say whether someone else had moved it. The gun had nine rounds in the magazine and one in the chamber, and there were no usable prints obtained from the gun. Schade could not opine when each set of fingerprints was left on the victim's car. He focused mainly on taking prints from the passenger side of the car. He did not dust the driver's side of the car for fingerprints, and he did not test any of the items found in the trunk of the victim's car.

KPD Officer Edward Johnson, another latent print examiner, testified that he verified Schade's fingerprint examinations and reached the same result. Officer Johnson also personally collected the fingerprints of J'Andre Hunt and determined that they did not match any of the latent prints taken from the victim's car.

J'Andre Hunt testified that he met the victim through Kevaughn "Lil Kill" Henry, one of his older friends whom he knew as "Kill." Hunt did not know the Defendant at the time, and he did not recognize the Defendant at trial. He also did not know the codefendant. Hunt denied being in the victim's car on the day of the offense, and he testified that he did not shoot the victim or try to rob him. He confirmed that he went to the police station on the night of the offense and provided them with a statement, fingerprints, and a buccal swab. On cross-examination, he agreed that he had been in the victim's car several different times, and he acknowledged that he told the police during his interview that they would find his fingerprints in the victim's car. Hunt stated that the victim would come over to his house twice a week, and they would "chill in the driveway" and smoke weed. He was not aware that the victim was selling pills or drugs, and he communicated with the victim primarily through Facebook.

Alex Brodhag, an expert in firearm identification and examination with the Tennessee Bureau of Investigation (TBI), performed a "muzzle to gun and distance determination" on a jacket worn by the victim to determine the distance from the muzzle of the gun when it was fired to the victim's clothing. Brodhag was only able to determine that there was gun powder residue in five out of eight holes in the victim's jacket. The presence of gunpowder indicated that the gun was shot within six feet of the victim, and his report reflecting such was admitted into evidence. On cross-examination, Brodhag could not explain why some of the holes did not have gunpowder residue around them. He agreed one explanation was that the gunpowder residue could have fallen off prior to

- 13 -

it being tested.  He also stated that, without the suspect firearm, he could not determine the distance from which the shots were fired at the victim.

KPD crime technician Stephanie Housewright went to the home of Linda Hatch on November 20, 2015, and took several photographs, which were entered into evidence. The photographs showed the back of the house, the back porch, and two nine millimeter shell casings, which she collected as evidence.

Kim Lowe, a forensic biologist for the TBI, testified that she created DNA profiles for the victim, the Defendant, and the codefendant, and her report was admitted as an exhibit.  She matched the t-shirt and the glove found in the victim's car to the codefendant.  The Powerade bottle contained only the DNA of the victim and an unknown female.  The victim's jacket tested positive for the DNA of the victim, but the results as to the major contributor were inconclusive.  Agent Lowe also tested the swabs from the rear and front passenger headrests, which were inconclusive.  On cross-examination, Agent Lowe confirmed that none of the items that she tested were positive for the Defendant's DNA.  She also established that the victim's jacket was transported multiple times from the inception of the case based on the chain of custody records.

Linda Hatch provided testimony at trial which was consistent with her testimony from the juvenile transfer hearing.  Additionally, Hatch testified that when the Defendant came to her house the morning after the offense, the following occurred:

> And when I had my children to leave the room, he had his head bowed in his hands and he was crying a little bit.  And I said "Ty, honey, what's wrong?"  And he said, "momma, I f--ked up."  And I said, "what?  Baby, what?  What, Ty fly, what's wrong?"  And he was trying to talk.  And I said "it's okay.  Is it you and mom? Is it you and your mom?  Is it you and your brother?"  "No, momma.  I've f--ked my life up."  And I said "what have you done, Ty?  What did you do?"  And he said "momma, I killed a man."  And I said "what, Ty?  What?  No you didn't."  And he said "yes, I did, momma.  We killed him."  And I said "you killed who?"
>
> And I thought my mind was totally in denial because my Ty wouldn't do that.  And he said "momma, momma, I shot a man and I killed him and I didn't mean to.  And I'm sorry.". . . And I said "what do you mean you killed someone, Ty?"  And he said, "momma, it went so wrong. We were just supposed to meet the man, get some weed, take his money. We wasn't supposed to hurt him.  Savvy said we would just take his drugs and money."

- 14 -

. . .

And I said "let's slow down and go back." "Ty, did you take that gun and shoot--did you kill somebody with that gun?" He said, "yeah." "But I didn't mean to, mom." He said, "Savvy called the boy up and set it up. Said he would meet us and we would just get it, you know, get his money. Get the weed. And we would go. But it went bad." And I said, "like what happened? What happened, Ty? What happened?" And he said when he got there it happened so fast, momma. It happened so fast. He said he pulled up. We got--we was just going to, you know, get in and he said Savvy grabbed him and was going to hold him and I was just going to grab, you know, was going to grab the money, grab the weed, and we were gonna go. And he fought and he broke loose. Savvy couldn't hold him. And momma, Savvy said shoot him. Shoot him, Ty. And Ty said, "I pulled the trigger and when I pulled it, I couldn't stop. It just kept shooting. And when I stopped--when I let go--when I realized what was going, I had emptied all the bullets." And I said "how do you know you killed him? You could have wounded him. You could have scared him. That don't mean [sic] you killed him, Ty." And he said, "momma, he was dead. That n---er, we left him dangling dead and we took off running. He was dead."

The Defendant also told Hatch that he threw the gun away and took off running after he shot the victim. He said his brother bought him a clip of hollow point bullets, and that he "blew [the victim's] chest out[.]" Hatch saw the Defendant the following day and described his demeanor as "very proud, happy, almost very swag cool" that morning. The Defendant told Hatch that the news had the wrong description of the suspects. He also told Hatch that he had shot the victim in the back.

The next day, the Defendant was arrested at Hatch's home, and shortly thereafter, the codefendant was arrested. Hatch subsequently provided the police with the video of the Defendant, the codefendant, and another friend, "Ears Tate," walking around her house, which was entered into evidence. The video showed Ears Tate with the Defendant's gun "stuck down his pants." Ears Tate pointed the gun at the codefendant and said "boom, boom, boom, boom," and the Defendant said, "give me back my gun."

Hatch also provided the State with copies of Facebook messages between her and the Defendant, which were admitted as an exhibit. Hatch could not recall when she gave these messages to the State. The Defendant's name on Facebook was "Ty Hellabands Booker." In these messages, Hatch and the Defendant talked about tattoos, the Defendant's gun, and drugs. The parties stipulated that "Hatch first provided the State of

Tennessee with a set of Facebook messages previously introduced into this record at trial in August of 2017."

On cross-examination, Hatch testified that she thought of the Defendant as one of her children. She asked the Defendant what kind of drugs he had so that she could tell her husband what the Defendant was bringing into her home. Hatch denied asking the Defendant if he wanted to "go in half" on buying "weed[,]" but explained that her niece had sent these messages from her phone. Hatch also sent the Defendant pictures of marijuana and told him that the "flower man" was "taking orders." She explained that this referred to one of the Defendant's friends selling marijuana. Hatch also sent the Defendant a link to an image of a woman's breasts, which she explained was to get the Defendant's opinion on a cake that she was making. Hatch also took what she described as "sexy" photographs of the Defendant and sent them to him. Hatch said she never smoked weed with the Defendant and that her relationship with the Defendant was "absolutely not" sexual.

A custodian of records for Sprint, Tom Koch, testified and authenticated four call detail records associated with the victim's phone number, (865) 216-[xxxx], which were denoted in central standard time. The first three calls were made to the same number, (865) 227-[xxxx], later determined to belong to the Defendant's girlfriend, Jada Mostella. These calls occurred at the following times: (1) 16:03:33 and ended at 16:04:04; (2)16:10:32 and ended at 16:11:04; and (3) 16:18:08 and ended at 16:18:45. The fourth call was made to (865) 577-[xxxx], later determined to belong to the Defendant's friend, Shanterra Washington, and occurred at 16:18:57 and ended at 16:19:58. There were no further outbound calls made from this number. Koch agreed that the "non-entries" would indicate that the phone was off or outside the range of cell service. Jada Mostella testified and confirmed her phone number, as reflected in the first three calls on the victim's cell phone. At the time of the offense, Mostella was dating the Defendant. She also knew the codefendant, but she did not know the victim, Kevaughn "Lil Kill" Henry or J'Andre Hunt. Shanterra Washington testified and confirmed her home phone number, as reflected in the fourth call on the victim's cell phone. She said the Defendant was her best friend and that she knew the codefendant. She did not know the victim or Kevaughn "Lil Kill" Henry, and that she was familiar with J'Andre Hunt.

Kevaughn "Lil Kill" Henry testified that he knew the Defendant and the victim, and that he had been in the victim's car prior to his death. Henry had viewed the Defendant's Snapchat account in the summer of 2015, and observed the Defendant shooting a gun that "looked like a 9 mm[,]" from someone's back porch. Henry believed that the codefendant was with the Defendant in the video. Henry explained that Snapchat videos disappear within 24 hours after being uploaded, and he did not save this video. He said he informed the State of the video "somewhere pretty early in [the Defendant's]

case." Henry also provided a statement to the police after the victim was killed. Henry testified that he was good friends with the victim, and that he was not involved in the victim's death. On cross-examination, Henry agreed that his fingerprints were found on the victim's car and that he was initially a suspect.

Tiffany Springer lived in South Knoxville with Linda and Heath Hatch and her little brother. She met the Defendant at school and described him as an older brother. She testified that he came to her house every day after he met Linda Hatch. Springer also knew the codefendant and Ears Tate, and she acknowledged that they referred to themselves as the "Chain Gang." Prior to the offense, Springer observed the Defendant and the codefendant in possession of a gun, but she never saw them shoot a gun. On the morning after the offense, the Defendant came to Springer's home to speak to Hatch. Springer overheard the Defendant say, "'I f'ed up my life.'" She also heard him say, "'I didn't know what to do, I panicked so I just--I kept going. I kept pulling it.'" Springer stated that when the Defendant came back to her house the next morning, he "wasn't acting the same as he did on Monday." On cross-examination, Springer stated that she had discussed the Defendant's arrest and the events surrounding it many times with her mother. Springer saw the Defendant smoking marijuana, but she never saw her mother smoking with the Defendant. Springer had a Facebook account in November 2015, but she never communicated with the Defendant via Facebook Messenger. She was aware that her mother communicated with the Defendant through Facebook Messenger, but she never used Hatch's Facebook Messenger to communicate with the Defendant about drugs.

Heath Hatch, Linda Hatch's husband, was a maintenance technician and worked a 6:00 a.m. to 4:00 p.m. shift. He saw the Defendant and the codefendant in his home multiple times, and he observed the Defendant with a "black 9 mm." The Defendant told Heath that the gun was not working properly, and Heath inspected the gun and tried to disable it, but he was unable to do so. Heath never saw the Defendant fire the gun, but he did observe several shell casings in his backyard. Heath testified on cross-examination that he was not aware of his wife smoking marijuana with the Defendant.

Detective Thomas Thurman with the KPD Violent Crimes Unit responded to the scene of the offense the following morning and identified two public information press releases regarding the crime and the suspects, which were admitted as exhibits. Detective Thurman also participated in the interviews of J'Andre Hunt and Kevaughn "Lil Kill" Henry. Detective Thurman received information regarding the Facebook accounts of the Defendant and the codefendant, and he used their fingerprints to apply for arrest warrants. Although Detective Thurman executed a search warrant of the Defendant's residence, it did not produce anything of value to the investigation. Detective Thurman also interviewed Hatch, retrieved a video from her laptop, and unsuccessfully attempted

to locate the victim's cell phone. Detective Thurman also confirmed that the murder weapon was never recovered. In regard to Hatch, Detective Thurman said that she told him to "write [her] check bigger," during an interview, that he told her they were "working on getting [her] processed" as an informant, and that she was never officially an informant. Hatch also wanted KPD to pay her for her son's basketball that was destroyed when the police arrested the Defendant.

Christine Fitzgerald, the Employee Benefits and Risk Management Director for the City of Knoxville, testified that Detective Thurman filed a claim for damaged property belonging to Linda Hatch, which was approved for $30. Hatch signed a release of claims liability. KPD Sergeant Andrew Boatman testified that Hatch had not acted as a controlled informant for the KPD in the past or at the time of the Defendant's trial. Neither Heath Hatch nor Springer served as confidential informants for the KPD. On cross-examination, Sergeant Boatman testified that the KPD does not keep records of every person who "raises the possibility of acting as a confidential informant with anyone in the police department." Sergeant Boatman was also qualified as an expert in narcotics distribution and investigation, and he testified that the victim had "Roxicodone 30s" in his car on the night that he was killed. He stated that it was possible, based on the items recovered from the victim and his car, that the victim was engaged in the "distribution or possession with the intent to distribute controlled substances."

Patricia Resig, an expert in the field of firearms, examined the following from the crime scene: a nine millimeter Luger caliber bullet recovered from the victim's right shoulder; a fired nine millimeter caliber bullet recovered from the victim's right chest wall; a fired nine millimeter caliber bullet recovered from the victim's right chest cavity; a fired nine millimeter caliber bullet recovered from the victim's left chest wall; a fired nine millimeter caliber bullet recovered from the victim's stomach; and a fired nine millimeter caliber bullet recovered from the left sleeve of the victim's jacket. The bullet recovered from the victim's right chest cavity was a hollow point bullet, indicating that it was Federal ammunition, and the other bullets were consistent with Winchester ammunition. Resig determined that the six bullets "display[ed] consistent class characteristics," and that there was "[s]ome agreement of the individual characteristics [which] could have been fired through the same unknown barrel."

In regard to the five shell casings recovered from the crime scene, Resig determined that there was "a lack of sufficient matching individual characteristics[,]" but opined that "all the casings could have been fired in the same unknown gun." Four of the casings recovered from the crime scene were nine millimeter Luger caliber Winchester cartridge casings, and one was a nine millimeter Luger caliber Federal cartridge case. Resig also examined the cartridges recovered from Hatch's back porch, and she determined that both were nine millimeter Luger caliber Federal cartridge cases.

She determined that these two cartridge cases and one cartridge case recovered from the crime scene were fired from the same unknown firearm. She determined that the other four cartridge casings recovered from the scene could have been fired from the same firearm. Resig also examined the nine millimeter SCCY semi-automatic handgun recovered from the victim's car, and she determined that none of the cartridge casings recovered from the crime scene were fired from that gun. Lastly, Resig examined a .32 caliber handgun which was previously identified and introduced as the gun that was confiscated from the codefendant when he was arrested. She testified that this gun would not fire nine millimeter ammunition; therefore, it did not fire any of the casings recovered from the crime scene or from Hatch's back porch. Resig's report of her findings was admitted as an exhibit at trial.

The parties entered a stipulation and agreed that "[i]n June [] 2015 Tyshon Booker and [the codefendant] were observed in each other's company."

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox County, testified as an expert in forensic pathology. Dr. Mileusnic-Polchan performed the autopsy on the victim and confirmed that he had four gunshot wounds to the back of his body. She also found "a lot of money" on the victim's body. Dr. Mileusnic-Polchan examined the jacket that the victim was wearing, and she testified that there were several holes in the jacket that matched up to the victim's gunshot wounds. She used a mannequin to demonstrate the trajectory of the bullets. The toxicology report revealed that the victim had a marijuana metabolite in his system when he died. The victim's manner of death was homicide, and his cause of death was multiple gunshot wounds.

The Defendant testified that he was in the victim's car on November 15, 2015, along with the codefendant. However, the Defendant said that he did not intend to rob the victim. The Defendant insisted that he shot the victim because he thought the victim was going to shoot him or the codefendant. The Defendant described his background at trial. He grew up with his mother and four brothers. His father was killed two weeks before he was born. He described his relationship with his mother as "rocky," and he stated that he would get kicked out of the house when he argued with his mother. The Defendant had a close relationship with his grandfather, who was stabbed to death. The Defendant grew up in East Knoxville, but his family moved to South Knoxville prior to the offense. The Defendant attended South Doyle High School, went to school "from time to time," and regularly smoked marijuana with his friends.

The Defendant met Linda Hatch on July 29, 2015, after his mother kicked him out of the car and Hatch offered him a ride. He got in Hatch's car, and she told him that she was his neighbor and her daughter was always talking about him. The Defendant stated that he and Hatch smoked marijuana while he was in her car. After that, the Defendant

began going to Hatch's house daily. He spent the night at Hatch's house, and she gave him tattoos and bought him things. They smoked marijuana and drank alcohol together. The Defendant communicated with Hatch through Facebook Messenger, and he described several of the messages sent between them. He did not communicate with her daughter, Springer, through Hatch's Facebook account. The Defendant sold crack cocaine, and Hatch helped him find buyers. The Defendant also described two sexual encounters that he had with Hatch. The Defendant testified that he had a nine millimeter gun in November 2015, and that he shot it at Hatch's house. He said the codefendant also had a gun, but it did not function correctly.

The Defendant described the events leading up to the death of the victim as follows. The codefendant showed the Defendant a Snapchat video from the victim inviting him to smoke marijuana, and the victim eventually picked them up in his car. The codefendant sat in the front-passenger seat, and the Defendant sat in the back-passenger seat. The Defendant stated that he had never seen the victim or his car prior to the day of the offense. The Defendant could not recall when the victim picked them up, and he did not know how long they were in the victim's car. He said his gun was hidden under his shirt on his right hip, so the victim would not have known that he had a gun. The victim asked them if they knew where to buy marijuana, and he offered them Oxycodone pills. They each took two pills, and the victim drove them to a different house and gave the codefendant money to buy marijuana. The Defendant and the victim waited in the car and listened to music while the codefendant went inside to get the marijuana. The victim then drove to a gas station and bought cigars to smoke the marijuana.

The Defendant stated that he planned to meet his girlfriend, Jada Mostella, later that day, and he used the victim's cell phone to call her. He also planned to stop by his grandfather's house on Linden Avenue, and he asked the victim to take him there. The Defendant, the victim, and the codefendant rode around in the victim's car "smoking and listening to music[,]" and the Defendant tried to call Mostella again. He also tried to call his friend, Shanterra Washington. The Defendant stated that he was trying to call again when they pulled up to his grandfather's house on Linden, and he saw the victim reach over to the codefendant's pockets. The Defendant had the victim's phone in his right hand when the codefendant and the victim began to fight. The codefendant said, "F—k," and hit the victim. The codefendant told the Defendant that the victim had a gun, and they continued to wrestle for the gun. The Defendant said the victim was holding the codefendant with his right arm while "bobbing and weaving," and the codefendant was swinging at the victim. "[The victim] started mushing [the codefendant] while reaching underneath his seat." The Defendant said he "felt the need to help [the codefendant]," and the codefendant "put [his] hands up like [he] was gonna swing on [the victim]." The victim said, "So you all are going to gang me[,]" and reached for his gun. Asked if there

was anything preventing the Defendant from getting out of the car at that point, the Defendant replied, "Yeah, my friend that's preventing--I'm not about to leave [the codefendant], we came here together, we're gonna leave together." The Defendant pulled out his gun as he saw the victim turn towards him with a gun. The Defendant said he was scared, and he thought the victim was going to shoot him or the codefendant, so he shot the victim. The Defendant said the victim "didn't stop" so the Defendant shot him several more times. Eventually, the victim "stopped coming for [them][,]" dropped his gun, opened his door, and fell out. The Defendant and the codefendant then got out of the car and ran. As the Defendant was running, he threw away the gun and the victim's cell phone. He had not realized he still had possession of the victim's phone until he was running from the car. When he was unable to reach Hatch, he called his mother to get a ride home. The next morning, the Defendant went to Hatch's house and told her that he shot someone. He denied telling her that he had tried to rob the victim, and he insisted that he told her the same thing that he was telling the jury.

On cross-examination, the Defendant agreed that it "made sense" that fingerprints belonging to him and the codefendant were found on the victim's car. The Defendant also stated that he did not know Kevaughn "Lil Kill" Henry and that neither Kevaughn "Lil Kill" Henry nor J'Andre Hunt were in the victim's car with them on the day of the offense. The Defendant had the gun in his right hand and the victim's cell phone in his pocket when he got out of the car. The Defendant was unaware that the victim had cash in his right pocket, and he did not see where the victim had the pills. The State introduced one of the Defendant's Facebook posts, which said, "I been thru it all…robbed n---as, got robbed, shot at, shot back, couple n---az got whacxed [sic]. I done been thru it all." The Defendant explained that these were rap lyrics, and the defense played the song for the jury. On redirect examination, the Defendant stated that he never intended to steal the victim's cell phone, and that he did not know he had it until after the fight.

Following submission of the above proof, the jury found the Defendant guilty as charged, and upon merging count two into count one, the trial court imposed a sentence of life imprisonment. On March 16, 2018, the trial court conducted a sentencing hearing during which several of the victim's family members gave statements about the impact of the victim's death on their lives. A psychological evaluation and follow-up examination conducted by Dr. Keith Cruise was also admitted as an exhibit to the hearing. Following merger of counts three and four, the trial court imposed a twenty-year sentence to be served concurrently to count one, for an effective sentence of life imprisonment.

On May 29, 2018, the Defendant filed a "Motion for Evidentiary Hearing and New Trial Based on the Jury's Misconduct and Exposure to Extraneous Information." In an accompanying affidavit, defense counsel averred that, following the verdict, the Knox County Public Defender's Office sent letters to the petit jury asking to discuss certain

aspects of the Defendant's case.  Defense counsel subsequently spoke to juror Lambert, who told them that the jury looked up information regarding the number of years the Defendant would serve for a life sentence in Tennessee during deliberations.  Following this discussion, defense counsel attempted to contact the other jurors. Investigator Gerald Witt of the Knox County Public Defender's Office also provided an affidavit stating that he contacted juror Lambert, and she told him that the jurors looked up "terminology" relevant to the Defendant's case and shared that information with the entire jury.  The State subsequently filed a "Motion to Prohibit Inquiry into Validity of Verdict."  At a hearing held on June 1, 2018, the trial court agreed to subpoena juror Lambert to testify at the Defendant's motion for new trial regarding potential juror misconduct during deliberations.

On June 12, 2018, the Defendant filed a "Motion to Subpoena Additional Juror to Testify at Evidentiary Hearing on Jury Misconduct."  Defense counsel asserted that they had received information from a second juror, who stated that "several jurors had been using Google to look up terms during deliberations."  Investigator Witt provided another affidavit stating that this juror told him that jurors had looked up the "Webster meaning" of certain words that it was unclear about.  At a June 22, 2018 hearing, the Defendant argued that it was necessary for the court to subpoena a second juror to testify as well, but the trial court denied the Defendant's request.

On July 2, 2018, the trial court conducted a hearing on the Defendant's motion for new trial.  Juror Lambert testified that she was one of twelve jurors who heard and decided the Defendant's case. Lambert testified that the jury looked up the definition of terms on the internet during deliberations.  She testified, in relevant part, as follows:

> The only thing that we looked up was the life sentence and how many years it involved, whether it was a 20[-]year sentence or--but we figured out--found out in the State of Tennessee it's 51 years automatic.
>
> . . .
>
> As far--and then the only other thing was-- that we looked up was terminology and it's been so long that I honestly could not tell you what the exact words were, but it was just a definition.  I do know that.  It was a definition and it had to--it was a medical word was one of them.
>
> . . .

I don't recall what the word was, but it was a medical word that someone didn't understand, so we just Googled the word to find out what the definition was.

Juror Lambert explained that this occurred in the jury room and that "somebody got on their phone and looked this up[.]" Although only one person used his or her phone to look up this information, all of the jurors heard it. She could not recall the medical term that the jury looked up, but she stated, "It was a term that had come up in trial." Lambert asserted that the jury did not look up anything concerning the Defendant or the facts surrounding his case. She said both terms were looked up during the jury's deliberations, but she believed that the jury followed the trial court's instructions during deliberations and in rendering its verdict. The Defendant argued for the need to subpoena the second juror to determine what other possible terms the jury looked up during deliberations, which was denied by the trial court.

The trial court denied the Defendant's motion for new trial by written order on July 24, 2018. On August 8, 2018, the Defendant filed a timely notice of appeal, and this case is now properly before this court for our review.

## ANALYSIS

**I.  Apprendi Violation.**  As an issue of first impression in Tennessee,[3] the Defendant contends that the juvenile transfer hearing process as outlined in Tenn. Code Ann. § 37-1-134(a)(4), violates the holding in Apprendi v. New Jersey, 530 U.S. 466 (2000). In Apprendi, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S. Ct. 2348. This concept applies to any fact that will "expose the defendant to a greater punishment than that authorized by the jury's verdict." Id. at 494, 120 S.Ct. 2348; see also Blakely v. Washington, 542 U.S. 296, 303, 124 S.Ct. 253, (2004) (clarifying that for purposes of Apprendi, the "statutory maximum" is the maximum term of imprisonment a court may impose "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant"). The Defendant argues, based

---

[3] But see Brandon Mobley v. State, No. E2010-00379-CCA-R3-PC, 2011 WL 3652535, at *19 (Tenn. Crim. App. Aug. 18, 2011), aff'd in part, rev'd in part, 397 S.W.3d 70 (Tenn. 2013) (concluding that counsel was not ineffective in failing to challenge juvenile transfer hearing based on Apprendi)(citing Gonzales v. Tafoya, 515 F.3d 1097, 1110-13 (10th Cir. 2008)).

on the principles espoused in Apprendi, that the findings of the juvenile court judge at the transfer hearing exposed him to "the possibility of vastly increased punishment, from incarceration until age nineteen to life imprisonment." As such, the Defendant insists this is a "straightforward" violation of his Sixth Amendment right to a jury trial and the Fourteenth Amendment due process requirement of proof beyond a reasonable doubt. In response, the State contends that Tennessee's juvenile transfer procedure does not violate Apprendi. The State relies on the historic role of Tennessee juvenile courts and the majority view of other jurisdictions that have rejected Apprendi's application to juvenile transfer proceedings. Based on the following reasoning and analysis, we agree with the State, and conclude that the Tennessee juvenile hearing transfer statute does not fall within the scope of Apprendi.

We review issues of constitutional law de novo with no presumption of correctness attaching to the legal conclusions reached by the courts below. State v. Davis, 266 S.W.3d 896, 901 (Tenn. 2008); State v. Burns, 205 S.W.3d 412, 414 (Tenn. 2006). "Neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." See In re Gault, 387 U.S. 1, 14 (1967) (applying various due process rights to juvenile proceedings including notice of charges, right to counsel, right of confrontation and cross-examination, and privilege against self-incrimination); In re Winship, 397 U.S. 358 (1970) (proof-beyond-reasonable-doubt standard applies to delinquency proceedings); Kent v. United States, 383 U.S. 541, 562 (1966)(holding that the [adjudication] "hearing must measure up to the essentials of due process and fair treatment"); Breed v. Jones, 421 U.S. 519 (1975) (double jeopardy protection applies to delinquency proceedings); but see McKeiver v. Pennsylvania, 403 U.S. 528, 545 (1971) (plurality opinion holding that a trial by jury is not constitutionally required for juvenile court adjudications).

Juvenile courts in Tennessee have exclusive original jurisdiction over children alleged to be delinquent. Tenn. Code Ann. § 37-1-103(a)(1) (2011); State v. Hale, 833 S.W.2d 65, 66 (Tenn. 1992). A juvenile court may transfer a child to be dealt with as an adult in the criminal court of competent jurisdiction after a petition has been filed alleging delinquency based on conduct that is designated a crime and before hearing the petition on the merits. Tenn. Code Ann. §37-1-134(a) (2014). The disposition of the child *shall* be as if the child were an adult if the child is sixteen years old or more at the time of the alleged conduct and the charged offense is, inter alia, first degree murder. Id. (emphasis added). At the time of the instant offense, in determining whether to transfer the child to criminal court, the juvenile court was required to find "reasonable grounds to believe" that (A) the "child committed the delinquent act as alleged;" (B) the "child is not committable to an institution for the developmentally disabled or mentally ill;" and (C) the "interests of the community require that the child be put under legal restraint or discipline." Id., §37-1-134(a)(1), (4)(A)-(C). Additionally, in determining whether to

- 24 -

treat a juvenile as an adult as outlined in section (a)(1), the court must also consider, among other matters, the following:

(1) The extent and nature of the child's prior delinquency records;

(2) The nature of past treatment efforts and the nature of the child's response thereto;

(3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(4) Whether the offense was committed in an aggressive and premeditated manner;

(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and

(6) Whether the child's conduct would be a criminal gang offense...if committed by an adult.

Id., 37-1-134(b). Hearings pursuant to this part *shall be conducted by the court without a jury*, in an informal but orderly manner, separate from other proceedings not included in § 37-1-103, and pursuant to Rule 27 of the Tennessee Rules of Juvenile Procedure. Tenn. Code Ann. § 37-1-124 (a) (emphasis added). A transfer to criminal court pursuant to this section "terminates the jurisdiction of the juvenile court over the child with respect to the delinquent acts alleged." Tenn. Code Ann. § 37-1-134(c). Moreover, regardless of the seriousness of the offense, any child shall be released from a juvenile court's jurisdiction upon the child's nineteenth birthday. Tenn. Code Ann. § 37-5-103 (4)(A)(b)-(c), (B)-(D)(2011).

In Burns, 205 S.W.3d at 417, the Tennessee Supreme Court cited favorably the reasoning of McKeiver and concluded that article I, section 8 of the Tennessee Constitution does not provide a juvenile defendant with a jury trial upon appeal of a determination by juvenile court to transfer jurisdiction to criminal court. In Burns, the Tennessee Supreme Court characterized the juvenile court system as follows:

"[T]he system for dealing with juvenile offenders *as juveniles* is separate and distinct from the criminal justice system. On those occasions when a

juvenile is transferred to criminal court to be tried *as an adult,* he or she is afforded the full panoply of constitutional rights accorded to criminal defendants, including jury trials. Defendant in this case is not, however, being tried as an adult. He is being tried within the context of a system that was designed to avoid much of the trauma and stigma of a criminal trial. We agree with the United States Supreme Court that "one cannot say that in our legal system the jury is a *necessary* component of accurate factfinding." A jury's "necessity" is further attenuated in the context of juvenile delinquency proceedings, which are aimed not at punishing the youthful offender, but at rehabilitating him. We are also persuaded that the McKeiver decision is correct in its concern for the juvenile court's "ability to function in a unique manner" in the absence of a jury. Finally, we agree with Justice Blackmun's observation that, "[i]f the formalities of the criminal adjudicative process are to be superimposed upon the juvenile court system, there is little need for its separate existence. Perhaps that ultimate disillusionment will come one day, but for the moment we are disinclined to give impetus to it."

Burns, 205 S.W.3d at 417 (emphasis in original) (internal citations omitted). Finally, we are mindful that juvenile proceedings are not "criminal prosecutions." Id. at 418 (citing Childress v. State, 133 Tenn. 121, 179 S.W. 643, 644 (1915) (recognizing that "proceedings before a juvenile court do not amount to a trial of the child for any criminal offense" and that "the proceedings in a juvenile court are entirely distinct from proceedings in the courts ordained to try persons for crime")); see also Breed v. Jones, 421 U.S. at 535 (recognizing that juvenile transfer statutes represent an attempt to impart to the juvenile-court system the flexibility needed to deal with youthful offenders who cannot benefit from the specialized guidance and treatment contemplated by the system).

In Apprendi v. New Jersey, the adult defendant fired several .22-caliber bullets into the home of an African-American family that had recently moved into a previously all-white neighborhood. 530 U.S. at 469-71. The defendant was subsequently arrested, admitted that he was the shooter, and upon further questioning, admitted that "even though he did not know the occupants of the house personally, 'because they are black in color he [did] not want them in the neighborhood.'" Id. Although he was later indicted on multiple counts, none of the counts referred to the hate crime statute, and none alleged that the defendant acted with a racially biased purpose. Id. The parties entered into a plea agreement, and the State reserved the right to request the court to impose a higher "enhanced" sentence on the ground that the shooting offense was committed with a biased purpose, as described in the hate crime statute. The defendant, correspondingly, reserved the right to challenge the hate crime sentence enhancement on the ground that it violated the United States Constitution. Id. The trial court accepted the plea agreement.

- 26 -

Following an evidentiary hearing on the issue of the defendant's "purpose" for the shooting, the trial court enhanced the defendant's sentence based on the hate crime statute upon finding "that the crime was motivated by racial bias" and that the defendant's actions were taken "with a purpose to intimidate" as provided by the statute. The defendant appealed, arguing, *inter alia,* that the Due Process Clause of the United States Constitution required that the finding of bias upon which his hate crime sentence was based must be proved to a jury beyond a reasonable doubt. Id. The United States Supreme Court agreed and reasoned due process of law guaranteed "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury," which entitled a criminal defendant to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." Id. (internal citations omitted). Under Apprendi, "Any fact that increases the penalty to which a defendant is exposed constitutes an element of a crime," Apprendi v. New Jersey, 530 U.S. at 483, n. 10, and "must be found by a jury, not a judge[.]" Cunningham v. California, 549 U.S. 270, 281 (2007); see also Gall v. United States, 552 U.S. 38, 51 (2007); Alleyne v. United States, 570 U.S. 99 (2013); and Jones v. United States, 574 U.S. 948 (2014).

The Defendant argues in effect that the findings of the juvenile court pursuant to the juvenile transfer statute, are equivalent to the sentencing enhancement that was struck down as unconstitutional in Apprendi. We respectfully disagree. State and federal courts across the nation facing challenges to juvenile transfer laws have repeatedly refused to apply the Apprendi rule to waiver hearings on the following grounds: (1) waiver hearings only determine a jurisdictional matter; (2) waiver hearings do not adjudicate guilt or culpability; (3) the unique nature of the juvenile-justice system warrants different constitutional requirements; (4) and the history of juvenile transfer shows judicial fact-finding is constitutional. See MARK KIMBRELL, IT TAKES A VILLAGE TO WAIVE A CHILD ... OR AT LEAST A JURY: APPLYING APPRENDI TO JUVENILE WAIVER HEARINGS IN OREGON, 52 Willamette L. Rev. 61, 91-92 (2015); but see Commonwealth v. Quincy Q, 434 Mass. 859, 864, 753 N.E.2d 781, 789 (2001), overruled on other grounds by Com. v. King, 445 Mass. 217, 834 N.E.2d 1175 (2005). Upon our review, we now join the majority and decline to apply Apprendi to the Tennessee juvenile transfer process.[4]

---

[4] United States v. Miguel, 338 F.3d 995, 1004 (9th Cir. 2003) (Apprendi inapplicable because it does not create a per se increase of a defendant's punishment; rather, it establishes jurisdiction only); Gonzales v. Tafoya, 515 F.3d 1097, 1110-1116 (10th Cir. 2008) (comprehensive review of other jurisdictions' analyses of Apprendi's applicability to juvenile court transfer proceedings and noting that "forty-five states and the District of Columbia have enacted statutes allowing judges to transfer juveniles to adult court after making specified findings" and that "amenability and commitment findings have not traditionally been made by juries"); Morales v. United States, No. 09 CIV 5080 LAP, 2010 WL 3431650, at *9 (S.D.N.Y. Aug. 31, 2010); Parks v. Sec'y, DOC, No. 311-CV-1213-J-39, 2014 WL 6610750, at *7 (M.D. Fla. Nov. 21, 2014) (holding, "with the twin considerations of historical practice and respect for

As an initial matter, we conclude that Tennessee juvenile transfer hearings are dispositional, rather than adjudicatory. As noted in our principle authority, juvenile proceedings are not criminal prosecutions, and transfer determinations do not determine guilt or innocence. The transfer statute and the resulting findings of the juvenile court function only to determine the most appropriate forum to address the conduct for which the juvenile defendant is charged. We additionally conclude that even if Apprendi applied to the juvenile hearing transfer process, there can be no violation of the Defendant's Sixth Amendment right to a jury trial in this case. There is no question that the juvenile transfer statute exposed the Defendant to greater punishment. The Defendant's focus here however is misplaced because the statutory maximum sentence for purposes of Apprendi is not release upon the Defendant's nineteenth birthday as argued by the Defendant. The Apprendi rule applies only to statutes that enhance sentences beyond the prescribed statutory range for a given offense. See id. at 494 n.19 (majority opinion); In re M.I., 989 N.E.2d 173, 191-92 (2013). In this case, the Defendant was convicted by a jury of first-degree felony murder, which, for juvenile offenders, is statutorily punishable by a maximum sentence of life without parole, see Charles Everett Lowe-Kelley v. State, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at *9 (Tenn. Crim. App. Feb. 24, 2016) (noting that "Miller did not hold that a juvenile can never be sentenced to life without the possibility of parole" before upholding the juvenile defendant's consecutive life sentences as constitutional), perm. app. denied (Tenn. June 23, 2016)). Even applying the substance over form test to our analysis, as argued by the Defendant, we are not convinced Apprendi was intended to be so broadly

state sovereignty, Apprendi and its progeny have not been extended by the United States Supreme Court to apply to a prosecutor's pre-trial jurisdictional charging decision"); State v. Andrews, 329 S.W.3d 369, 372-75 (Mo. 2010), as modified on denial of reh'g (Jan. 25, 2011) (juvenile certification as an adult did not equate to sentence enhancement but instead determined jurisdiction); Kirkland v. State, 67 So. 3d 1147, 1149-50 (Fla. Dist. Ct. App. 2011)( explaining that the 6th Amendment right to a jury trial does not attach "to every state-law 'entitlement' to predicate findings," "Apprendi and subsequent cases are based on the 'historic jury function of deciding whether the State has proved each element of the offense beyond a reasonable doubt," and that, so far, "the Court has not extended the Apprendi and Blakely [v. Washington, 542 U.S. 296 (2004) ] line of decisions beyond the offense-specific context that supplied the historic grounding for the decisions"); State v. Rudy B., 149 N.M. 22, 243 P.3d 726 (2010) (Apprendi does not apply to the evidentiary hearing to determine whether a juvenile adjudicate as a youthful offender should be sentenced as a juvenile or as an adult); State v. Read, 397 N.J. Super. 598, 610, 938 A.2d 953, 960 (App. Div. 2008) (recognizing that transferring a juvenile to criminal court "substantially increases his sentencing exposure," but nonetheless holding that "the requirement of jury fact-finding based on proof beyond a reasonable doubt does not apply to a pretrial determination such as whether to waive a complaint against a juvenile to adult court."); Perkins v. Commonwealth, 511 S.W.3d 380, 388 (Ky. Ct. App. 2016) (citing Caldwell v. Commonwealth, 133 S.W.3d 445, 452-53 (Ky. 2004) (employing a rational basis test to determine that the classification of juveniles does not violate the state or federal equal protection clauses);Villalon v. State, 956 N.E.2d 697, 702 (Ind. Ct. App. 2011).

construed. Accordingly, under these circumstances, the Defendant has failed to establish a violation of his Sixth Amendment right to a jury, and he is not entitled to relief.

**II. Juvenile Transfer Hearing.** Although the Defendant concedes that "there was sufficient evidence to find probable cause that [he] had committed a crime," he contends that the juvenile court erred in transferring his case to criminal court. Noting that the juvenile court "correctly" narrowed the issue at the hearing to "the possible rehabilitation of the child," he argues that there was no evidence supporting the juvenile court's "untutored intuition as to the futility of treatment," especially in light of the defense expert's opinion to the contrary. The State argues, and we agree, that there were reasonable grounds to believe that the Defendant committed a juvenile act for which he could be tried as an adult. Accordingly, the juvenile court properly transferred the Defendant to criminal court to be tried as an adult.

This court reviews a juvenile court's findings in determining whether reasonable grounds exist to establish the criteria in Tenn. Code Ann. § 37-1-134 (a) for an abuse of discretion. State v. Kayln Marie Polochak, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at *38 (Tenn. Crim. App. Jan. 16, 2015) (citations omitted). In making the determination of whether a juvenile court properly transferred a case, this Court has held:

> The court is only required to find that there are "reasonable grounds" upon which to base a finding that a juvenile is not amenable to rehabilitation. The juvenile court, in its role of Parens patriae, is placed in a unique position with regard to the persons appearing before it. The juvenile judge is experienced in the evaluation of youthful offenders and is given a wide range of discretion in attempting to establish the most beneficial course of action in rehabilitating those offenders. In making a decision whether a juvenile is amenable to treatment or rehabilitation, the juvenile judge may consider many factors including testimony by expert witnesses, the type of facilities available, length of stay in these facilities, the seriousness of the alleged crime, and the attitude and demeanor of the juvenile.

State v. Strickland, 532 S.W.2d at 920; State v. Layne, 546 S.W.2d 220, 224 (Tenn. Crim. App. 1976); State v. Christopher Bell, No. W2014-00504-CCA-R3-CD, 2015 WL 1000172, at *4 (Tenn. Crim. App. Mar. 4, 2015). "The court can in good faith rely on all or none of these factors as long as there are reasonable grounds supporting the decision." Christopher Bell, 2015 WL 1000172, at *4. "This court has also stated that a defendant's conduct surrounding the offenses and the serious nature of the offenses impact that

defendant's amenability for rehabilitation." Id. (citing State v. Robert William Holmes, No. 01C01-9303-CC-00090, 1994 WL 421306, at *3 (Tenn. Crim. App. Aug. 11, 1994).

The Defendant takes issue with the juvenile court's finding that he could not be properly rehabilitated by the time he turned nineteen and was released from juvenile custody. The Defendant focuses solely on his expert witness's testimony, and he asserts, "the State's evaluating expert did not offer any testimony that would have supported the Juvenile Court's conclusion that treatment would be inadequate." Although the Defendant argues that the juvenile court limited its decision to (b)(5) based on the juvenile court's comment that it was the "more important factor in this case," we disagree. The record shows that the juvenile court conducted a thorough transfer hearing that spanned three days. Not only did the juvenile court order a psychological evaluation of the Defendant, which was performed by Dr. Axtell, the court also heard extensive testimony from the Defendant's independent expert, Dr. Cruise. The juvenile court also heard testimony from the Defendant's supervisor for the first offender program, who testified that the Defendant did not follow through on his probation requirements. The juvenile court considered Dr. Cruise's testimony and agreed with both mental health experts "completely." However, when the juvenile court considered Tenn. Code Ann. § 37-1-134(b)(5), the Defendant's potential for rehabilitation, the juvenile court struggled with the amount of time left to rehabilitate the Defendant based on his age. After weighing the amount of time before it lost jurisdiction over the Defendant based on his age against the seriousness of the crime and the safety of the community, the juvenile court determined that the Defendant should be transferred to criminal court to be tried as an adult. Because the record shows the juvenile court had "reasonable grounds" to believe that the Defendant committed first degree felony murder and that the interests of the community required that the Defendant be put under legal restraint, the Defendant is not entitled to relief.

**III. Brady Violation in Juvenile Court.** The Defendant contends the State withheld "evidence that the shooting was perpetrated by two individuals who were not [the Defendant]" until "well after" the Defendant's juvenile transfer hearing. He asserts that this information was material to his transfer hearing and, by not providing the information, the State violated his right to a "fair transfer hearing." He argues that the "relevant inquiry" is not whether this information was provided by or useful at his trial in criminal court, but "whether the information would have been useful at the transfer hearing." He asserts that such information was both relevant and material because: (1) "the State's inculpatory evidence consisted merely of fingerprint evidence and of Linda Hatch's testimony[,]" and (2) "the decision to transfer was explicitly predicated on the Juvenile Court's confidence that [the Defendant] was indeed guilty of murder as alleged by the State." The Defendant maintains that Brady applies to juvenile transfer hearings

and that the juvenile court ordered the State to turn over exculpatory material to the Defendant. The Defendant states that the Brady information was material because (1) it was third party culprit evidence, and (2) it could have been used to "cast doubt over the competence and thoroughness of the investigators."

In response, the State contends that Brady does not apply to juvenile transfer hearings. Alternatively, the State argues that even if Brady does apply to juvenile transfer hearings, the Defendant has failed to establish the materiality of the proof at issue. The State argues that the evidence presented at the juvenile transfer hearing was "more than enough to at least establish probable cause" and that the alleged Brady material would have been "frail disputing proof." The State also asserts that the Defendant had the "purported Brady proof" by the time of his trial in criminal court but that he was "no longer interested in this proof" at that time and instead he testified that he shot the victim in self-defense.

Throughout the contentious proceedings and the numerous filings of the parties in this case, the juvenile court repeatedly stressed its concern to avoid "trial by ambush" and compared the transfer hearing to a "probable cause hearing on steroids[.]" In its December 10, 2015 order, the juvenile court ordered the State to "provide the defense with copies of discovery that the State intend[ed] to use at the transfer hearing, as well as exculpatory discovery as defined under Brady, at least two (2) weeks prior to the transfer hearing." At the same time, the Defendant filed a motion to dismiss based on a violation of Brady, arguing that the State failed to turn over information pertaining to Kevaughn "Lil Kill" Henry, whose fingerprints were also found on the victim's car and who provided a recorded interview to police. The juvenile court determined that there had not been a Brady violation; however, it again ordered the State to "give [the Defendant] anything [it had] with regard to Mr. Henry." Following transfer to criminal court to be tried as an adult, on November 23, 2016, the Defendant filed yet another motion to dismiss the indictment based on a Brady violation, arguing that "the State suppressed material exculpatory evidence . . . that an eyewitness identified two other people as the perpetrators--from the defense at the transfer hearing in Juvenile Court[.]" The trial court held a hearing on the Defendant's motion on February 10, 2017.

Clayton Madison, a detective in the KPD Violent Crimes Unit, testified that around 11:30 p.m. on the night of the offense, the victim's brother received a call from someone named "Junkyard," who told him that he saw J'Andre Hunt and Jaquez Hunt running from the victim's car at the time of the offense. The victim's brother notified KPD of this information the same night and sent them an email with two photographs showing Kevaughn "Lil Kill" Henry, J'Andre Hunt, and Jaquez Hunt. The photographs were admitted into evidence at the hearing. Within two days of the offense, Detective Madison conducted recorded interviews of J'Andre Hunt, Kevaughn "Lil Kill" Henry,

and the codefendant, all of which were admitted into evidence. Kevaughn "Lil Kill" Henry denied involvement in the offense and explained that his fingerprints were on the victim's car because the victim had picked him up from a restaurant a day or two before the offense. J'Andre Hunt denied involvement in the offense and claimed he was at home watching football at the time, which was later confirmed by his mother. J'Andre Hunt further advised that his cousin, Jaquez Hunt, was at work at the time of the offense, which was later confirmed by independent investigation. Detective Mason also confirmed that there were no identifiable fingerprints of J'Andre Hunt and Jaquez Hunt at the crime scene. Detective Madison attempted to speak to "Junkyard," but he refused to provide his real name and denied making any statements to the victim's brother. Finally, the codefendant confirmed that he was in the victim's car when the Defendant robbed the victim of his watch and phone and that the Defendant shot the victim in the process.

Detective Madison was pressed by defense counsel regarding when he provided the information confirming the identity of J'Andre Hunt and Jaquez Hunt as well as the photograph of them with Kevaughn "Lil Kill" Henry, but he could not recall the exact date. He "assume[d]" that the State had this information prior to the Defendant's transfer hearing. The Defendant also introduced as exhibits to the hearing a discovery response filed by the State on September 21, 2016, in criminal court, a subsequent discovery response filed on September 30, 2016, a discovery request filed in juvenile court by the Defendant on November 23, 2015; an order from the juvenile court on December 10, 2015, requiring that Brady information be turned over prior to the transfer hearing; and a set of emails sent between the prosecutor and defense counsel on September 27, 2016.

Defense counsel explained to the trial court that the Brady violation concerned information that was not provided prior to the June 10, 2016 juvenile transfer hearing, which deprived the Defendant of a fair transfer hearing. On September 21, 2016, she was notified that the State had an "eyewitness who put two other people at the scene" and that they had interviewed J'Andre Hunt. Upon further requesting the information via email, she received it on September 30, 2016, four months after the transfer hearing. Defense counsel stressed that the juvenile court had previously ordered the State to provide the defense "anything you got with regard to Mr. Henry." The defense vigorously argued that the photograph showing Kevaughn "Lil Kill" Henry with J'Andre and Jaquez Hunt was Brady material and that the State violated the juvenile court order by failing to produce it before the transfer hearing.

In response, the State advised the trial court that they had provided the defense with Kevaughn "Lil Kill" Henry's statement. She further explained that she did not consider the statement of J'Andre Hunt to be exculpatory because he denied fleeing from the scene and investigation subsequently confirmed that he had an alibi. Additionally, given the other evidence of the Defendant and the co defendant's guilt, she did not

believe information pertaining to J'Andre Hunt was exculpatory. She also insisted that prior to the transfer hearing she was unaware whether there was a true eyewitness to the "suspects fleeing the scene" information or whether this was an investigative technique employed by the officers. Upon later speaking with Officer Madison, she provided the information in discovery to the defense concerning "Junkyard's" statements and then categorized it as Brady material.

Although the trial court agreed that the information qualified as Brady material, it denied the Defendant's motion to dismiss the indictment reasoning as follows:

> The question before this Court is, one, has there been a Brady violation? And typically, folks, we're always considering whether or not there's been a Brady violation after a trial has occurred and whether or not that impacted a defendant's right to a fair trial. That's the standard. Just because the State may or may not have turned over some piece of information which may or may not have been exculpatory does not automatically, if that fact is proven, equate to having a new trial.

> I think it is significant that [the Juvenile Court] was not required to find proof beyond a reasonable doubt. As the fact finder in Juvenile Court, he was required to find probable cause. He had to find the other criteria, as required by the statute, but he was required to find probable cause. So the question becomes, does the fact that the Defense did not have the information that they now have in preparation of their defense for [the Defendant] before the trier of fact in this court, the jury, does that equal and equate to their right to have this case dismissed at this juncture and sent back to Juvenile Court? This Court finds that it does not.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" Clause of Article I, section 8 of the Tennessee Constitution afford all criminal defendants the right to a fair trial. In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution." Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence has also been defined as "evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." Id. at 56-57

- 33 -

(quoting Commonwealth v. Ellison, 376 Mass. 1, 379 N.E.2d 560, 571 (1978)). This also includes "favorable information that would have enabled defense counsel to conduct further and possibly fruitful investigation regarding the fact that someone other than the appellant killed the victim." Johnson v. State, 38 S.W.3d at 56 (citing State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. June 30, 1992.)). In Gumm v. Mitchell, 775 F.3d 345, 364 (6th Cir. 2014), the United States Court of Appeals for the Sixth Circuit held,

> Prosecutors are not necessarily required to disclose every stray lead and anonymous tip, but they must disclose the existence of "legitimate suspect[s]," D'Ambrosio v. Bagley, 527 F.3d 489, 499 (6th Cir. 2008). "Withholding knowledge of a second suspect conflicts with the Supreme Court's directive that 'the criminal trial, as distinct from the prosecutor's private deliberations, [be preserved] as the chosen forum for ascertaining the truth about criminal accusations.'" United States v. Jernigan, 492 F.3d 1050, 1056-57 (9th Cir.2007) (en banc) (quoting Kyles v. Whitley, 514 U.S.419, 439 (1995)).

Rule 206 of the Rules of Juvenile Practice and Procedure governs discovery issues in juvenile court and provides, in pertinent part, that "[e]ach juvenile court shall ensure that the parties in delinquent and unruly proceedings have access to any discovery materials consistent with Rule 16 of the Rules of Criminal Procedure." Tenn. R. Juv. Prac. & Proc. 206(a). However, a "juvenile court transfer hearing 'is the exact counterpart of the General Sessions preliminary hearing to the extent of the issue of probable cause.'" State v. Dennis Joe Hensley, No. E2005-01444-CCA-R3-CD, 2006 WL 2252736, at *8 (Tenn. Crim. App. Aug. 7, 2006) (citing State v. Womack, 591 S.W.2d 437, 443 (Tenn. Ct. App. 1979)). "[T]here is no provision for discovery, as such, as a part of a pre-trial 'probable cause hearing,'" and "the reception of evidence at such a hearing should properly be confined to issues before the court at the time." Womack, 591 S.W.2d at 443. The Advisory Commission Comment to Rule 206 provides, in pertinent part, as follows:

> [D]iscovery rules do not apply to preliminary examinations and hearings. Therefore, this rule would not apply to any probable cause hearing in juvenile court with the caveat that this rule is not the exclusive procedure for obtaining discovery. Please note that some discovery may be critical in a transfer hearing. The Court should use its discretion in granting access to information necessary to defend or prosecute a transfer case. *The state must disclose any exculpatory evidence to the child's attorney per Brady v. Maryland, 373 U.S. 83 (1963).*

Tenn. R. Juv. Prac. & Proc. Rule 206 Advisory Comm'n Cmt. Rule 206 (emphasis added). Accordingly, it is within the discretion of the juvenile court to grant access to information necessary to defend or prosecute a transfer case, and obviously, the State must disclose any exculpatory evidence to the child's attorney per Brady. This is consistent with our principle holdings above, concluding that a juvenile transfer hearing is a critical stage in the proceedings which "must measure up to the essentials of due process and fair treatment." Kent v. United States, 383 U.S. at 560-62; see also State v. Iacona, 2001-Ohio-1292, 93 Ohio St. 3d 83, 92, 752 N.E.2d 937, 947 (Ohio 2001) (holding that the State is under a constitutional duty to "disclose to a juvenile respondent all evidence in the state's possession favorable to the juvenile respondent and material either to guilt or punishment that is known at the time of a mandatory bindover hearing. . . and that may become known to the prosecuting attorney after the bindover"). Accordingly, we conclude that the Defendant was indeed entitled to Brady material at the transfer hearing.

We must now determine if the evidence that was not disclosed at the transfer hearing constitutes Brady material and the effect, if any, the nondisclosure had on the determination of the juvenile court to transfer the Defendant to be tried as an adult. Evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, 514 U.S. at 433 (citation omitted); State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). As the United States Supreme Court explained,

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles, 514 U.S. at 434 (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)). The burden of proving a Brady violation rests with the defendant, and the violation must be proved by a preponderance of the evidence. Edgin, 902 S.W.2d at 389 (citing State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)). In order to establish a Brady violation, the defendant must show the existence of four elements: (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not); (2) that the State withheld the information; (3) that the withheld information was favorable; and (4) that the withheld information was material. Johnson v. State, 38 S.W.3d at 56.

The record clearly establishes that the Defendant requested the State to disclose Brady material in juvenile court prior to the transfer hearing, which was supported by the order of the juvenile court. Emails exchanged between defense counsel and the State establish that the Defendant did not know about two other potential suspects interviewed by the police or that they had photographs of these same individuals with Kevaughn "Lil Kill" Henry until September 27, 2016, well after the Defendant's transfer to criminal court. Detective Madison confirmed that he received this information from the victim's brother on the night of the offense. Although Detective Madison could not recall when he provided this information to the State, the evidence was in the possession of the police prior to the transfer hearing, and they failed to provide it to the defense. See State v. Jackson, 444 S.W.3d 554, 594 (Tenn. 2014) (citing Kyles 514 U.S. at 439; Johnson, 38 S.W.3d at 56). Nevertheless, we conclude that the information concerning the other potential suspects was neither favorable nor material to the Defendant's transfer hearing. Detective Madison testified that he interviewed J'Andre Hunt and Jaquez Hunt, both of whom were quickly eliminated as suspects based on their alibis and other information discovered by the police. These individuals did not appear to be legitimate suspects, but rather, stray leads that were dismissed early in the case. See Bagley, 527 F.3d at 499. Additionally, at the Defendant's transfer hearing there was testimony that the Defendant had confessed to Hatch that he shot the victim in the back as a result of a robbery gone "bad." The Defendant's fingerprints were also found in several areas of the exterior and interior of the victim's car, which was consistent with the Defendant's confession to Hatch. This evidence was more than enough to support the juvenile court's finding of probable cause, and we do not believe that the information about two potential suspects that were abandoned very early into the case would have impacted the decision to transfer to criminal court to be tried as an adult. Accordingly, the Defendant is not entitled to relief.

**IV. Defendant's Duty to Retreat before Engaging in Self-Defense.** The Defendant concedes that he was engaged in unlawful activity at the time of the offense; specifically, the possession of a weapon as a minor. He argues, however, that this offense is "not the kind of illegal activity that is contemplated by the [self-defense] statute." Although he acknowledges that State v. Perrier, 536 S.W.3d 388 (Tenn. 2017), declined to address the necessity of a causal nexus between the unlawful activity and the need to engage in self-defense, he insists that the trial court erred in instructing the jury that he had a duty to retreat because there was not a causal nexus between his status as a minor in possession of a firearm and the need for him to defend himself and codefendant Robinson. Based on the physical fight between the codefendant and the victim, the Defendant argues the jury should have been instructed that he had "no duty to retreat" before using force against the victim. He argues further that the error was not harmless because the State relied heavily on the Defendant's duty to retreat before using force

against the victim in its closing arguments. Lastly, the Defendant argues that allowing the trial court to make the factual finding of whether a defendant was engaged in unlawful activity under a clear and convincing standard, rather than allowing a jury to make this determination under a beyond a reasonable doubt standard, violates his constitutional rights to due process and a jury trial.[5]

In response, the State contends that the plain language of the self-defense statute does not require a causal nexus between a defendant's unlawful activity and his need for self-defense. The State asserts that, even if this Court imposes a causal nexus requirement, the Defendant has not established a nexus here because the Defendant's illegal possession of a firearm was connected to the "use of force," and minors in possession of handguns are similar to felons in possession of handguns. Regardless, the State argues any error in the jury instruction was harmless because the evidence of the Defendant's guilt was overwhelming.

A defendant in a criminal case has a constitutional right to a correct and complete charge of the law. State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011) (citing State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005); State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001); State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000)). It follows then that trial courts have a duty in criminal cases to instruct the jury on the law applicable to the facts of a case. State v. Clark, 452 S.W.3d 268, 294-95 (Tenn. 2014) (citing State v. Thompson, 285 S.W.3d 840, 842 n.1 (Tenn. 2009); State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999)). Whether jury instructions are sufficient is a question of law that this court reviews de novo with no presumption of correctness. Clark, 452 S.W.3d at 295 (citing State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013); Nye v. Bayer Cropscience, Inc., 347 S.W.3d 686, 699 (Tenn. 2011)). When reviewing challenged jury instructions, this court must "view the instruction in the context of the charge as a whole" in determining whether prejudicial error has occurred. Id. (citing State v. Rimmer, 250 S.W.3d 12, 31 (Tenn. 2008); State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997)). An instruction is prejudicially erroneous and requires reversal when "the instruction alone infected the entire trial and resulted in a conviction that violates due process," see State v. James, 315 S.W.3d 440, 446 (Tenn. 2010), or "when the judge's charge, taken as a whole, failed to fairly submit the legal issues or misled the jury as to the applicable law," see State v. Majors, 318 S.W.3d 850, 864-65 (Tenn. 2010). Id. "[A] person is entitled to a jury

---

[5] The Defendant acknowledges that the Tennessee Supreme Court rejected this issue in Perrier, which held that the trial court makes the determination of whether a defendant was engaged in unlawful activity such that the 'no duty to retreat' instruction would not apply. He has preserved this issue in the event of further litigation. As we are bound by Perrier, the Defendant is not entitled to relief as to this issue.

instruction that he or she did not have to retreat from an alleged attack only when the person was not engaged in unlawful activity and was in a place the person had a right to be." Perrier, 536 S.W.3d at 401 (footnote omitted).

> Tennessee's self-defense statute provides as follows:
>
> (b)(1) Notwithstanding §39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611. The Tennessee Pattern Jury Instructions on self-defense provide, in relevant part, as follows:

> Included in the defendant's plea of not guilty is *[his][her]* plea of self-defense.
>
> If a defendant was in a place where he or she had a right to be, he or she would have a right to *[threaten][use]* force against the *[deceased][alleged victim]* when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's *[use][attempted use]* of unlawful force. **[Remove this bracketed language if the trial court finds the defendant was engaged in unlawful activity after a hearing. See Comment Two**: The defendant would also have no duty to retreat before *[threatening][using]* force.**]**

- 38 -

[If a defendant was in a place where he or she had a right to be, he or she would also have a right to *[threaten][use]* force intended or likely to cause *[death][serious bodily injury]* if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds. **[Remove this bracketed language if the trial court finds the defendant was engaged in unlawful activity after a hearing. See Comment Two**: The defendant would also have no duty to retreat before *[threatening][using]* force likely to cause *[death][serious bodily injury]***]**.]

7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 40.06(b) (emphasis in original).

The trial court in the Defendant's case removed the bracketed language from the Tennessee Pattern Jury Instruction after finding that the Defendant was engaged in unlawful activity to wit: minor in possession of a firearm, see Tenn. Code Ann. § 39-17-1319, and, therefore, had a duty to retreat. It provided the following instruction to the jury:

Included in the defendant's plea of not guilty is his plea of self-defense.

The defendant would have a right to threaten or use force against the deceased when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use or attempted use of unlawful force.

The defendant would also have a right to threaten or use force intended or likely to cause death or serious bodily injury if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury was real or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds.

The law of self-defense requires that the defendant must have employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life. This requirement includes the duty to retreat if, and to the extent, that it can be done in safety.

- 39 -

The statute at issue here, Tenn. Code Ann. Section 39-11-611(b), does not define "unlawful activity" and is therefore not unambiguous. Additionally, while the Perrier court declined to address the causal nexus issue, in answering the question of whether the "unlawful activity" language modifies the entirety of the claim of self-defense or only applies to the no-duty-to-retreat qualification, it "examin[ed] the history and language of the statute because the statutory language is *not clear and unambiguous*." Perrier, 536 S.W.3d at 398 (emphasis added). In doing so, the Court observed that "[t]he abandonment of the duty to retreat was '[t]he primary distinction' between the common law and the statutory law of self-defense." Id. at 399 (citing 11 DAVID L. RAYBIN, TENNESSEE PRACTICE: CRIMINAL PRACTICE AND PROCEDURE, § 28:36 Self-defense (Dec. 2016 Update)). Based on State v. Renner, 912 S.W.2d 701, 704, (Tenn. 1995), the Perrier court determined that the phrase, "is in a place where the person has a right to be," was related to the "true man" doctrine. "The 'true man' doctrine is simply another term for the no-duty-to-retreat rule, and it provides that one does not have to retreat from a threatened attack."

> [T]his doctrine applies only: (1) when the defendant is without fault in provoking the confrontation, and (2) when the defendant is in a place where he has a lawful right to be and is there placed in reasonably apparent danger of imminent bodily harm or death.

Perrier, at 399 (citations omitted). The Defendant argues that the "engaged in unlawful activity" phrase is "an elaboration of the 'without fault in provoking the confrontation' requirement from the true man doctrine." He insists that the "without fault" language does not refer to fault in general, but rather, fault in causing the confrontation at issue. We agree.

At common law, the "true man" doctrine's primary prerequisite was that only "one without fault" is permitted to use deadly force. R. CHRISTOPHER CAMPBELL, UNLAWFUL/CRIMINAL ACTIVITY: THE ILL-DEFINED AND INADEQUATE PROVISION FOR A "STAND YOUR GROUND" DEFENSE, 20 Barry L. Rev. 43, 55 (2014) (citing Beard, 158 U.S. at 561). The common law cases to address the "without fault" requirement acknowledge that "the party in the wrong must do the retreating. Our law is more favorable to the man who is in the right, and places a less burden upon him in homicide cases than upon the man who is in the wrong and *produces* the occasion." Voight v. State, 109 S.W. 268, 270 (Tex. Crim. App. 1908)(emphasis added). Additionally, "[i]t is one of the fundamental principles of the law of homicide, whenever the doctrine of self-defense arises, that the accused himself must always be reasonably *free from fault, in having provoked or brought on the difficulty in which the killing was perpetrated*." Storey v. State, 71 Ala. 329, 336 (1882)(emphasis added).

To interpret the statute without a nexus between the "unlawful activity" and the duty to retreat would lead to absurd results. For example, if a defendant had failed to file her income taxes or failed to timely file her vehicle registration or failed to renew her gun license, then she would be unable to avail herself of Tennessee's self-defense statute. As one court has explained, application of the self-defense statute without a nexus to the conviction offense would nullify virtually every claim of self-defense. See Mayes v. State, 744 N.E.2d 390, 392 (Ind. 2001) (citing Oregon v. Doris, 51 Or. 136, 94 P. 44, 53 (1908) ("[T]o hold that the mere fact that a person accused of a homicide was armed at the time, and that because of the misdemeanor resulting therefrom [possession of a concealed weapon] he shall be deprived of any right of self-defense, would lead to the absurd and unjust consequence in practically all cases of depriving the accused of any defense...."); South Carolina v. Leaks, 114 S.C. 257, 103 S.E. 549, 551 (1920) (In a prosecution for homicide "[t]he causal connection between the unlawful act of gambling and the encounter arising during the progress of the game between the participants is too remote to destroy the right of self-defense."); West Virginia v. Foley, 128 W.Va. 166, 35 S.E.2d 854, 861 (1945) ("Whether [defendant] had a license to carry a pistol on the occasion he was armed is not relevant in the least to the common law right to arm for self-defense.")). Accordingly, we conclude that a causal nexus between a defendant's unlawful activity and his or her need to engage in self-defense is necessary before the trial court can instruct the jury that the defendant had a duty to retreat.

We must now determine whether there was a causal nexus between the Defendant's unlawful activity and his need to engage in self-defense, and what effect, if any, it had in this case. Arguably, the Defendant's status as a juvenile in possession of a handgun, a violation of Tenn. Code Ann. § 39-17-1319, could be the cause of the confrontation at issue in this case. In other words, but for the Defendant's illegal possession of the handgun as a minor, the victim would still be alive. However, status offenses such as this will rarely qualify as unlawful activity because a person's status alone cannot provoke, cause, or produce a situation. Nevertheless, in our view, the proof here overwhelming established a causal connection between the Defendant's robbery of the victim and the Defendant's perceived need to engage in self-defense. Because the Defendant was engaged in unlawful activity, to wit robbery, at the time of the offense, he had a duty to retreat, and was therefore not entitled to the protection of the Tennessee self-defense statute. Accordingly, the trial court properly instructed the jury, and the Defendant is not entitled to relief.

## V. Prosecutorial Misconduct Based on False Statements in Closing Argument.

As we will explain in more detail below, the parties in this case relied heavily on the Rosles' video footage, the dashcam footage from the patrol car, and the cell phone

records to establish a timeline for the offense. At the core of the Defendant's claim of prosecutorial misconduct is the State's miscalculation of these times during closing argument. The Defendant specifically argues that the State misstated the evidence regarding the timing of the shooting and the timing of the four phone calls made to the Defendant's girlfriends. In stating these times inaccurately, the State argued the Defendant made two calls on the victim's phone *after* the shooting, which the Defendant argues directly contradicted his testimony and undercut his credibility. The Defendant acknowledges that he failed to object to the State's closing argument and argues for plenary review given the unique circumstances of this case.

In response, the State contends that the Defendant waived this argument and that he is not entitled to plain error relief because defense counsel "made a conscious and considered strategic decision not to object to this argument because he did not believe that he had a good-faith basis for objection and had to 'let it go.'" Additionally, the State asserts that the Defendant should have anticipated the use of the timing because of the lengths the State went to in order to establish it and because the Defendant presented his own theory of the timing during his closing argument. Alternatively, the State argues that, even if this Court was to review this issue under the plain error doctrine, the Defendant would nevertheless not be entitled to relief because "the [D]efendant presents no evidence whatsoever that the State intentionally miscalculated, intentionally misled the jury or the court, or intentionally misstated the evidence." For the reasons that follow, we agree with the State, and conclude that the Defendant is not entitled to relief.

Based on the evidence adduced at trial, we have created the below timeline to illustrate the events on the day of the offense to better understand the position of the parties on this issue.



**5:25:30 p.m.**
Officer Wilson arrives at the victim's car.

**5:24:00 p.m.**
Officer Wilson receives
shots fired call on Linden



As previously noted, the Rosles's video did not have accurate time stamps. In an effort to ascertain the timing of events, the parties subtracted the time lapse between the arrival of Officer Wilson as shown on the Rosles's video, 7:00:06, from the dog jump, 6:54:00, which was six minutes and six seconds (6:06). Officer Wilson's arrival on the scene as accurately reflected on his dashcam, 5:25:30, minus the 6:06 time lapse from the Rosles's video, reflects that the dog jumped at 5:19:24. The parties agreed that the first shot occurred when the dog jumped. At closing argument, however, the State deduced that the first shot occurred at "5:18 something[.]" The State specifically argued, and the Defendant now contests, the following excerpts from their closing argument:

> So we say that puts the time of the first shot at 5:18, and here's how we get there. Right there at the bottom you'll see 5:25:30 is when Officer Wilson rolls up to -- to the scene.
>
> And so if you look, and I urge you to do this, look at Mr. Rosles's video and you'll see Officer Wilson show up at 16:07:06. So that's over six minutes after the first shot that Officer Wilson shows up, okay? So if he

shows up at 5:35 [sic], 5:19 plus a little bit more, 5:18 something is going to be the time that that first shot was made. And that's very important.

The State capitalized further from its timeline and additionally argued the following:

> We say the cell phone records, Mr. Cook [sic] told you a whole lot about, shows that this defendant used that cell phone twice *after* the killing. (emphasis added). And I say that because when you do the extrapolation, if I can call it that, when you match up these videos and go back over six minutes from the time Officer Wilson arrived, that gives you the time – the approximate time, within seconds I suggest to you, of when those first shots were fired Okay? And that rolls it back to 5:18 going on 5:19.

> He calls his female friends and that phone was turned on and off again 28 times up through the end of these records through November 30th. And these are the four calls that are pertinent, and if you will see, and remember you've got to add an hour, but those last two outbound calls from that phone were to two different females. One at 5:18, almost 5:19, and one at a minute apart 5:19, almost 5:20.

> Now, [the Defendant] would have you believe that he was done using that phone long before this skirmish broke out in the car. Well, think of it this way, if you add back the 97 seconds, before the five -- little over five minutes, six minutes, that's at seven and a half minutes or there abouts, if that -- according to his testimony that phone would have no longer been used by him. And these records show that he is not telling the truth about that.

As an initial matter, the record reflects that the Defendant failed to object during closing argument. Technically, as argued by the State, the failure to make a contemporaneous objection at the time these comments were made resulted in waiver of these issues. See Tenn. R. App. P. 36(a); Tenn. R. Evid. 103(a)(1). It is well-recognized that a defendant's failure to object to a prosecutor's comments during closing argument rarely results in a reversal of the conviction:

> Unobjected to closing arguments warrant reversal only in exceptional circumstances. United States v. Smith, 508 F.3d 861, 864 (8th Cir. 2007). Accordingly, like the United States Court of Appeals for the Eighth Circuit, "[w]e bear in mind that fleeting comments that passed without objection during the rough-and-tumble of closing argument in the

trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of an appellate judge's chambers." United States v. Mullins, 446 F.3d at 758.

State v. Banks, 271 S.W.3d 90, 132, n.30 (Tenn. 2008). We note that "where a prosecuting attorney makes allegedly objectionable remarks during closing argument, but no contemporaneous objection is made, the complaining defendant is not entitled to relief on appeal unless the remarks constitute 'plain error.'" State v. Thomas, 158 S.W.3d 361, 413 (Tenn. 2005) (citing Tenn. R. App. P. 36(b); State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000)); see State v. Pack, 421 S.W.3d 629, 648 (Tenn. Crim. App. 2013) (holding that because the defendant failed to make a contemporaneous objection during closing arguments, he not only had to establish that the comments were improper but also that they constituted plain error); State v. Gann, 251 S.W.3d 446, 458 (Tenn. Crim. App. 2007) (concluding that the defendant's failure to make a contemporaneous objection during the State's closing argument waived plenary review and allowed for consideration under plain error review only). The Defendant relies on State v. Hawkins, 519 S.W.3d 1 (Tenn. 2017), and State v. Zackary James Earl Ponder, No. M2018-00998-CCA-R3-CD, 2019 WL 3944008 (Tenn. Crim. App. Aug. 21, 2019), perm. app. denied (Tenn. Dec. 5, 2019), for the proposition that plenary review is appropriate in this case. However, those cases are readily distinguishable and generally involved the prosecutor's use of information in closing argument that was objected to pre-trial, which sufficiently preserved the issue for appellate review. Accordingly, we review this issue under plain error only.

The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

Smith, 24 S.W.3d at 282 (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record

that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

The Tennessee Supreme Court has consistently held that "'closing argument is a valuable privilege that should not be unduly restricted.'" State v. Reid, 164 S.W.3d 286, 320 (Tenn. 2005) (quoting State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)); see State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Closing argument gives each party an opportunity to persuade the jury of their theory of the case, see 11 DAVID L. RAYBIN, TENNESSEE PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 29.2, at 97 (2008), and to highlight the strengths and weaknesses in the proof for the jury. Banks, 271 S.W.3d at 130 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence or make derogatory remarks or appeal to the jurors' prejudices." Banks, 271 S.W.3d at 131 (internal citations omitted). A prosecutor's comments during closing argument must be "'temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law.'" State v. Johnson, 401 S.W.3d 1, 20 (Tenn. 2013) (quoting State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999)).

In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Joseph L. Ware, No. M2018-01326-CCA-R3-CD, 2019 WL 5837927, at *10 (Tenn. Crim. App. Nov. 7, 2019) (citing State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996)). This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict:

> (1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case.

Joseph L. Ware, 2019 WL 5837927, at *10 (citing State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000) (citations omitted)).

We conclude that the Defendant has failed to establish that a substantial right of his was adversely affected. In review of this issue, we recognize that the parties were dealing with "extrapolations" and deductions to discern a timeframe, a process which naturally lends itself to imprecision. Nevertheless, there can be no question that the State

erroneously calculated the time of the first shot as 5:18, rather than 5:19:24. This is significant because it directly contradicted the Defendant's version of events; specifically, his testimony that he used the victim's phone to call his girlfriends before the shooting occurred. Based on the misstatement by the State, it is conceivable that the Defendant was deemed less credible by the jury, and the State argued this exact point in closing. While this misstatement of the evidence was indeed improper, we are not convinced that it impacted the verdict in this case so as to deprive the Defendant of his due process right to a fair trial. Our review of the State's closing argument shows that the prosecutor mentioned the time of the shooting twice, which was fairly isolated compared to the length of the closing argument. When the prosecutor first mentioned how they calculated the first shot, she qualified the estimated time and encouraged the jury to look at the video and make the calculation for themselves. The bulk of the State's closing argument focused not on the time of the first shot but on the proof at trial; namely, the Defendant's confession to Hatch, fingerprint and DNA evidence inside and outside the victim's car, and the multiple gunshot wounds inflicted to the back of the victim. Accordingly, even assuming that this case boiled down to a credibility contest between Hatch and the Defendant, the State's error in misstating the time of the first shot by a minute and twenty-four seconds could not have tipped the credibility scale so much so to have changed the outcome of the trial. Having failed to establish plain error, the Defendant is not entitled to relief.

**VI. <u>Juror Misconduct.</u>** The Defendant argues that the trial court erred in denying his motion for new trial because the jury received extraneous, prejudicial information when, during deliberations, it looked up the "meaning of a life sentence in Tennessee" and a "medical word." He insists that "the mere fact that the jury sought this information out, in direct contravention of the judge's instructions, is strong evidence that it played some part in the deliberations," and that the State failed to carry its burden of showing that the exposure was harmless. The Defendant additionally argues that the trial court had an obligation to subpoena the second juror and conduct a hearing to ascertain what, if any, additional terms were looked up by the jury during deliberations. The Defendant requests de novo review of this issue and a remand of this case for a new trial or an evidentiary hearing at which the second juror, and possibly other jurors, would be called to testify. In response, the State agrees that the jury was exposed to extraneous information, but it argues that the jury's exposure to extraneous information was harmless. The State argues that the standard of review for the trial court's determination that the jury was not exposed to extraneous, prejudicial information is for an abuse of discretion. It further contends that the trial court did not abuse its discretion in declining to subpoena the second juror to testify at an evidentiary hearing because the Defendant failed to show that her testimony would have been "competent, material, and admissible." We agree with the State.

A defendant's right to a fair trial is guaranteed by the Sixth Amendment to the United States Constitution and by article I, section 9 of the Tennessee Constitution. Additionally, this court has said that every defendant is assured "'a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation.'" State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1995) (quoting Toombs v. State, 270 S.W.2d 649, 650 (Tenn. 1954)). Moreover, "[j]urors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." State v. Adams, 405 S.W.3d 641, 650 (Tenn. 2013) (citing Caldararo ex rel. Caldararo v. Vanderbilt Univ., 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990)). If the jury has been exposed to extraneous prejudicial information or subjected to an improper outside influence, the validity of the verdict is questionable and a new trial may be warranted. Id. (citing State v. Blackwell, 664 S.W.2d 686, 688 (Tenn. 1984)). Whether the constitutional right to an impartial jury has been violated is a mixed question of law and fact which we review de novo, granting a presumption of correctness only to the trial court's findings of fact. Id. at 656 (citing Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001)).

"A party challenging the validity of a verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." Adams, 405 S.W.3d at 651 (citing Caldararo, 794 S.W.2d at 740-41). Tennessee Rule of Evidence 606(b) explains what types of evidence may be used to challenge a verdict:

> **Inquiry Into Validity of Verdict or Indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b) (emphasis added). In short, Rule 606(b) "bars juror testimony and affidavits concerning jury deliberations but permits testimony and affidavits pertaining to extraneous prejudicial information, outside influence, and agreed quotient verdicts." Akins, 867 S.W.2d at 355 (citing Tenn. R. Evid. 606(b)).

The threshold inquiry is whether or not the information is "extraneous" and, (2) if "extraneous, whether or not said information was prejudicial, and (3) finally, if both extraneous and prejudicial, whether said extraneous prejudicial information had an influence on the jury. Kelli Whiteside v. Michael A. Hedge, No. E2004-02598-COA-R3-CV, 2005 WL 1248975, at *3 (Tenn. Ct. App. May 26, 2005) (citing Patton v. Rose, 892 S.W.2d 410, 414 (Tenn.Ct.App.1994); Cavalier Metal Corp. v. Johnson Metal Controls, 124 S.W.3d 122 (Tenn. Ct. App.2003)). "Extraneous information is information coming from a source outside the jury." State v. Clayton, 131 S.W.3d 475, 480 (Tenn. Crim. App. 2003) (citing State v. Coker, 746 S.W.2d 167, 171 (Tenn. 1987); NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE, § 6.06[4], at 6-51 (4th ed. 2000)). "[E]xtraneous prejudicial information is information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." Adams, 405 S.W.3d at 650 (citing Robinson v. Polk, 438 F.3d 350, 363 (4th Cir.2006); State v. Blackwell, 664 S.W.2d 686, 688-89 (Tenn. 1984); see also 27 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 6075 (2d ed.2012)). "[C]lear and convincing evidence of prejudice is required to meet the standards of Tennessee Rules of Evidence 606(b)." Id.

When it is shown that a juror has been exposed to extraneous prejudicial information or an improper influence, a rebuttable presumption arises and the burden shifts to the State to explain the conduct or demonstrate that it was harmless. State v. Smith, 418 S.W.3d 38, 46 (Tenn. 2013) (citing Adams, 405 S.W.3d at 651; Walsh v. State, 166 S.W.3d 641, 647 (Tenn. 2005)). Because of the potentially prejudicial effect of a juror's receipt of extraneous information, the State bears the burden in criminal cases either to explain the conduct of the juror or the third party or to demonstrate how the conduct was harmless. Id. at 46. Error is harmless when "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. (quoting State v. Brown, 311 S.W.3d 422, 434 (Tenn. 2010); Neder v. United States, 527 U.S. 1, 15 (1999)).

In State v. Adams, the Tennessee Supreme Court utilized the analysis in Walsh v. State, 166 S.W.3d 641 (Tenn. 2005) as well as "factor tests" employed by several federal circuit courts of appeals to provide the "proper framework for determining the probable, objective effect upon a verdict of a juror's exposure to either extraneous prejudicial information or an improper outside influence." 405 S.W.3d 641, 654 (Tenn. 2013). The Tennessee Supreme Court listed following factors to aid in the determination of whether the State has rebutted the presumption of prejudice:

(1) the nature and content of the information or influence, including whether the content was cumulative of other evidence adduced at trial; (2)

- 49 -

the number of jurors exposed to the information or influence; (3) the manner and timing of the exposure to the juror(s); and (4) the weight of the evidence adduced at trial.

Id.  "No single factor is dispositive.  Instead, trial courts should consider all of the factors in light of the ultimate inquiry—whether there exists a reasonable possibility that the extraneous prejudicial information or improper outside influence altered the verdict." Id. (citing Walsh, 166 S.W.3d at 649).

The State does not dispute that the testimony of juror Lambert established that the jury in the Defendant's case was exposed to extraneous information.  Based on the following analysis of the Adams factors, the trial court determined that this extraneous information was harmless:

> When applying these factors to the conduct which occurred in this case this Court finds the same to be harmless and holds that this conduct did not alter the verdict returned by this jury.

> The nature and content of the information learned from extraneous sources did not impact the verdict in this case.  The extraneous information consisted of learning the definition of certain medical terminology, and the jury's receipt of the definition of a "life sentence" in Tennessee which equals a sentence wherein an offender must serve fifty-one (51) calendar years before becoming eligible for parole.  Ms. Lambert was unable to specify what medical terms were "googled", and it would be pure speculation to assume that some unknown medical term adversely affected the verdict.  Likewise, this Court has carefully considered whether or not the information about the duration of a life sentence could impact the jury's verdict and finds that within the context of this case, that this information did not impact the verdict. Most significantly, none of the extraneous information imparted was about [the Defendant].

> Based upon the testimony received, it does not appear to be in dispute that all twelve (12) jurors learned about the extraneous information. Nor does there appear to be dispute that the information was acquired after deliberations began.

> When considering factor four, this Court finds that the evidence of [the Defendant's] guilt is simply overwhelming, to wit: [the Defendant's] finger and palm prints were found upon multiple locations from both within

- 50 -

and without the car where the homicide occurred; the victim was killed by multiple rounds from a 9 mm handgun where video evidence proved [the Defendant] possessed such a weapon within days preceding the homicide; the DNA of co-defendant (Bradley Robinson) was found on multiple items within the front seat of the vehicle; a 9 mm casing found within the crime scene matched a casing recovered from a location where [the Defendant] fired his 9mm weapon; the cellular phone records from the victim's phone prove the last usage of the phone prior to the victim's death was the placement of calls to individuals connected to [the Defendant]; [the Defendant] testified and admitted to firing the shots that killed [the victim] and to fleeing while in possession of the victim's cell phone after firing the shots; [the Defendant] admitted to Linda Hatch that he shot [the victim] in the course of a robbery that "went bad"; and the victim was shot at least six (6) times with five (5) entry wounds within the victim's back.

Upon our de novo review, State v. Smith, 418 S.W.3d at 48, we agree with the trial court, and conclude that the exposure to the extraneous information in this case was harmless. While it was highly improper for the jury to research this information in violation of the instruction of the trial court, the victim's cause of death was not in dispute, and as such, medical terms did not play a significant role in this case. Similarly, the meaning of a life sentence in Tennessee did not bear on the guilt or innocence of the Defendant. Because this information was not prejudicial, the Defendant is not entitled to a new trial on this issue. As to whether the trial court erred in refusing to subpoena the second juror to testify, we conclude that the trial court properly determined that it was unnecessary to do so. The affidavit of the second juror did not reveal anything that would "add to or supplement" the testimony of juror Lambert. It stated generally that the jury used Google to look up terms and the Webster dictionary definition of certain words. See e.g. State v. Keith Waggoner, No. E2018-01065-CCA-R3-CD, 2019 WL 4635589, at *20 (Tenn. Crim. App. Sept. 24, 2019) (internal citations omitted)(noting that inquiry into juror misconduct is not justified by potentially suspicious circumstances and that something more than unverified conjecture must be shown). Accordingly, we similarly conclude that the trial court did not abuse its discretion in not subpoenaing the second juror, and the Defendant is not entitled to a new evidentiary hearing on this matter.

**VII.** **Constitutionality of Automatic Life Sentence for Juvenile.** The Defendant argues that "an automatic sentence of life imprisonment (with release no sooner than fifty-one years) is unconstitutional for a juvenile." He invites this court to extend the United States Supreme Court's reasoning in Roper v. Simmons, 543 U.S. 551 (2005), Graham v. Florida, 560 U.S. 48 (2010), and Miller v. Alabama, 567 U.S 460 (2012), to hold that automatic life sentences, even with the possibility of parole, are unconstitutional for juveniles. While we understand the Defendant's argument, we must

reject his invitation as we are bound by court precedent.  See State v. Walter Collins, No. W2016-01819-CCA-R3-CD, 2018 WL 1876333, at *20 (Tenn. Crim. App. Apr. 18, 2018), appeal denied (Aug. 8, 2018), cert. denied, 139 S. Ct. 649 (2018) (collection of cases rejecting claim that a juvenile's mandatory life sentence in Tennessee, which requires service of fifty-one years before release, violates Miller and its progeny). Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

Based on the above authority and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE